# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-04-00259-CV

**Whitney Georgeann Smith, Appellant**

**v.**

**Texas Department of Protective and Regulatory Services, Appellee**

**FROM THE DISTRICT COURT OF TOM GREEN COUNTY, 119TH JUDICIAL DISTRICT
NO. B-02-0310-J, HONORABLE BEN WOODWARD, JUDGE PRESIDING**

## O P I N I O N

Appellant Whitney Georgeann Smith appeals from the trial court's order finding that termination of her parental rights was in the best interest of her child, K.N.S. Smith challenges the legal and factual sufficiency of the evidence supporting the trial court's finding. We hold that the evidence is sufficient to support termination and affirm the trial court's decision.

## BACKGROUND

Smith is the natural mother of K.N.S., who was born in January 2002, when Smith was 15 years old. Shortly after K.N.S.'s birth, the Texas Department of Protective and Regulatory Services (Department) received a referral alleging that Smith had used drugs during her pregnancy.

An investigator interviewed Smith, who admitted using marihuana before she knew she was pregnant. The Department closed the case after ruling out any misconduct.

In March 2002, the Department received two separate referrals alleging that Smith was screaming angrily at K.N.S. The investigator ruled out physical abuse or non-supervision by Smith but determined that her behavior created a considerable risk to K.N.S. As a result, the Department referred Smith to a provider for counseling and parent training. The provider closed Smith's case approximately five months later because Smith was uncooperative. At that point, the Department transferred Smith's case to the Department's Family Based Safety Services unit.

During this time, Smith was on juvenile probation and under a court order to remain in her father's home. She and K.N.S. lived in the home with her father and his girlfriend. Her involvement with the Juvenile Probation Department began when she was twelve years old. Her juvenile record includes five referrals for assaults with bodily injury between October 1998 and June 2003, as well as at least nine referrals for running away from home.

In September 2002, when Smith was three months pregnant with her second child, the Department received a referral stating that Smith had run away from her father's home. She left K.N.S. in the home and provided no information as to her whereabouts or when she would return. The referral also alleged that Smith's father had beaten her, leaving marks on her back and shoulders. The Department learned that on previous occasions Smith ran away from her father's home with K.N.S. and stayed with friends or her grandmother.

While Smith was still on runaway status, the Department obtained temporary managing conservatorship of K.N.S. and placed her with a foster family. The Juvenile Probation

Department then took custody of Smith and placed her in Smithlawn Maternity Home (Smithlawn) in Lubbock, where she was ordered to stay until the birth of her second child. During her stay at Smithlawn, Smith participated in counseling and a parenting class, and received a psychological evaluation.

Smith and her newborn son were released from Smithlawn in March 2003, and they returned to live with her father. K.N.S. remained in foster care, and Smith attended a weekly, hour-long visitation period with K.N.S. Smith remained under a court order to attend anger management and parenting classes, participate in individual counseling, and complete all other services offered to her by the Department. The Department's Family Service Plan (Service Plan) indicated that in addition to the court-ordered services, Smith was to complete a psychological evaluation and a drug and alcohol assessment.

Less than a month after returning to her father's home, Smith called the police because she and her mother had a physical fight outside the father's home. During the fight, the mother spat in Smith's face and beat her in the head with a purse. The following month, Smith again called police to her father's home because she witnessed her father's girlfriend allegedly threaten him with a knife during an argument.[1]

A third incident occurred in June 2003, when the police responded to a domestic disturbance call at the father's home. Smith told the police that she had a fight with her father during

---

[1] Smith later testified that after calling the police, she spoke to her father and his girlfriend and realized that she had misunderstood the situation. She testified that the girlfriend had a knife in her hand during the argument only because she was cutting food for dinner, not with the purpose of threatening the father.

which he struck her and pulled her hair when she attempted to leave the house. In the course of the fight, Smith brandished a knife at her father. The police officer on the scene observed a bruise on Smith's inner right arm, red marks on her back, and a scratch on her neck. Her father had a scratch and a bruise on his right wrist. After interviewing Smith and her father, the officer arrested Smith for assault causing bodily injury. Following the fight, the Department removed Smith's son from her custody, and the Juvenile Probation Department placed Smith in a juvenile facility. Smith ran away from the facility eight days later and remained on the run for more than four months, after which she returned to her father's home.

Smith was arrested again in November 2003 for outstanding warrants. The arresting officer asked Smith about an investigation in which she was suspected of forging a check. During the interview, Smith admitted that she and a friend stole a purse from which she forged a check, which she used at a restaurant. She also stated that her friend forged another check to pay for both of them to get their nails done. The officer released Smith but instructed her that he would inform her if a warrant issued for her arrest and give her time to turn herself in to authorities. When the officer informed her that he had the warrant, Smith ran away. Ultimately, Smith was arrested and incarcerated in the county jail for approximately two weeks.

During the months after Smith left Smithlawn, she did not fully comply with her Service Plan requirements. In April 2003, the Department arranged for a parent training specialist, Janel Monoghan, to go to Smith's home to conduct parent training. When Monoghan first called Smith to schedule an appointment, Smith indicated that she did not need parent training and refused to schedule an appointment. Monoghan called Smith once more, and Smith again indicated that she

4

did not need her services but agreed to an appointment for the following day. When Monoghan arrived at Smith's home for the appointment, Smith was not there. It was not until Monoghan made an unannounced visit to Smith's home a week later that Monoghan was able to talk with Smith and schedule an appointment for an assessment. Smith completed the parenting assessment, achieving an average score. Shortly thereafter, Smith ran away from her placement in the juvenile facility, and Monoghan was unable to contact her.

The Department asked Monoghan to reinstate the parenting classes in February of the following year. Appointments were scheduled during Smith's visitation period with her children, but she missed three appointments because she was either running from authorities or in jail. Smith also failed to complete a drug and alcohol assessment as required by her Service Plan and failed to complete her counseling requirements after she left Smithlawn.

After she was removed from Smith's custody, K.N.S. has remained with one foster family, the Harpers. Department evaluations and trial testimony indicate that K.N.S. is a healthy, happy child who is developing normally for her age. She has established a strong bond with the Harpers, who want to adopt her. During visitations between K.N.S. and Smith, K.N.S. was hesitant to go into the visitation room alone with Smith, and Mrs. Harper reassured K.N.S. by accompanying her into the room until she felt comfortable. Smith and the Department caseworker both testified that Smith only missed visitations with K.N.S. when she was running from law enforcement or in jail.

Following a bench trial, the court found that the Department proved by clear and convincing evidence that Smith failed to comply with the provisions of a court order that specifically

5

established the actions necessary for her to obtain the return of K.N.S. and that termination of the parent-child relationship was in the best interest of K.N.S. This appeal followed.

## STANDARD OF REVIEW

To terminate the parent-child relationship, the Department must satisfy a two-prong test. The Department must prove by clear and convincing evidence (1) that the parent committed an act or omission set forth as statutory grounds for termination[2] and (2) that termination of the parent-child relationship is in the best interest of the child. *See* Tex. Fam. Code Ann. § 161.001 (West 2002). The Department must prove both prongs of the test. *Holley v. Adams*, 544 S.W.2d 367, 370 (Tex. 1976).

Clear and convincing evidence is the measure or degree of proof that produces in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established. *In re C.H.*, 89 S.W.3d 17, 23 (Tex. 2002) (citing *State v. Addington*, 588 S.W.2d 569, 570 (Tex. 1979)). This heightened standard of proof is appropriate because termination is a drastic

---

[2] In this case, the statutory ground for termination is that Smith "failed to comply with the provisions of a court order that specifically established the actions necessary for [her] to obtain the return of the child who ha[d] been in the permanent or temporary managing conservatorship of the Department of Protective and Regulatory Services for not less than nine months as a result of the child's removal from [Smith] under Chapter 262 for the abuse or neglect of the child." *See* Tex. Fam. Code Ann. § 161.001(1)(O) (West 2002).

remedy of such weight and gravity that due process requires the state to justify termination of the parent-child relationship by more substantial proof than a preponderance of the evidence. *Id.* (citing *In re G.M.*, 596 S.W.2d 846, 847 (Tex. 1980)); *see also Santosky v. Kramer*, 455 U.S. 745, 747-48 (1982) (requiring that in termination cases "the state support its allegations by at least clear and convincing evidence"). Although parental rights are of constitutional magnitude, they are not absolute. *In re C.H.*, 89 S.W.3d at 26. Just as it is imperative for courts to recognize the constitutional underpinnings of the parent-child relationship, it is also essential that emotional and physical interests of the child not be sacrificed merely to preserve that right. *Id.*

In reviewing a legal-sufficiency challenge, we consider all of the evidence in the light most favorable to the finding and determine whether a reasonable trier of fact could have formed a firm belief or conviction that the finding was true. *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). Reviewing the evidence in the light most favorable to the judgment, while assuming the fact-finder resolved disputed facts in favor of its finding if it is reasonable to do so, gives appropriate deference to the fact-finder's conclusions. *Id.* The court should disregard evidence a reasonable fact-finder could have disbelieved or found incredible, but should not disregard undisputed facts that do not support the finding. *Id.*

Termination findings must be upheld against a factual sufficiency challenge if the evidence is such that a reasonable fact-finder could form a firm belief or conviction that grounds exist for termination and that termination is in the best interest of the child. *C.H.*, 89 S.W.3d at 18-19. This departs from the traditional factual sufficiency review, in which the court determines whether a finding is so against the great weight and preponderance of the evidence that it is

7

manifestly unjust. The supreme court has held that the traditional standard is inadequate in parental termination cases in which findings must be based on clear and convincing evidence. *J.F.C.*, 96 S.W.3d at 264 (citing *C.H.*, 89 S.W.3d at 25).[3]

Smith challenges the legal and factual sufficiency of the evidence supporting the finding that termination of the parent-child relationship was in K.N.S.'s best interest. Although proving grounds for termination under section 161.001(1) does not relieve the Department of proving termination is in the best interest of the child under section 161.001(2), the same evidence may be probative of both issues. *C.H.*, 89 S.W.3d at 28. Factors to consider in determining the best interest of the child include: (1) the desires of the child; (2) the present and future emotional and physical needs of the child; (3) the present and future emotional and physical danger to the child; (4) the parenting abilities of the individuals seeking custody; (5) the programs available to assist the parent seeking custody; (6) the plans for the child by the parent or agency seeking custody; (7) the stability of the home or the proposed placement; (8) any acts or omissions of the parent that may indicate that the existing parent-child relationship is not a proper one; and (9) any excuse for the acts or omissions of the parent. *Holley*, 544 S.W.2d at 371-72. This list is not exhaustive; other factors may be considered if appropriate. *Id.* at 372. Likewise, a fact-finder is not required to consider all the listed factors in coming to a finding that termination is in a child's best interest. *Id.* That is, absence of evidence regarding some of the factors does not prevent a reasonable fact-finder from forming a

---

[3] Likewise, the legal sufficiency standard of review set forth in *J.F.C.* departs from the traditional "anything more than a scintilla" legal sufficiency standard because of the heightened burden of proof required in parental rights termination cases. *See In re J.F.C.*, 96 S.W.3d 256, 264-65 (Tex. 2002).

strong belief or conviction that termination is in the child's best interest. *C.H.*, 89 S.W.3d at 27. We note that this test focuses on the interest of the child, not the needs or desires of the parent. *See Brice v. Denton*, 135 S.W.3d 139, 160 (Tex. App.—Waco 2004, pet. filed).

## SUFFICIENCY OF EVIDENCE

Smith challenges the legal and factual sufficiency of the evidence supporting the finding that termination of the parent-child relationship was in K.N.S.'s best interest. She does not challenge the trial court's finding that her failure to comply with a court order was grounds for termination. However, the evidence presented to support a ground for termination under the first prong of the statutory test may also be probative of whether termination is in the best interest of the child under the second prong. *See C.H.*, 89 S.W.3d at 28.

Accordingly, we first look at evidence supporting the trial court's finding that Smith failed to comply with a court order. After K.N.S. was placed in foster care, Smith was under a court order to obtain a psychological evaluation and participate in counseling sessions. She was also ordered to complete parenting and anger management classes and submit a certification of completion to the Department or file it with the court within seven days of completion. In addition, Smith was ordered to complete all services offered to her by the Department, including a drug and alcohol assessment. Although Smith completed some of the requirements during her stay at Smithlawn, including enrolling in a parenting class, attending individual counseling, and obtaining a psychological evaluation, she testified that she did not provide proof to the Department even when specifically asked to do so. She also testified that she did not provide the Department with contact information with which to verify that she completed the services. In addition, Smith failed to attend

four drug and alcohol assessments scheduled by the Department's caseworker. When the caseworker referred Smith to a therapist for anger management counseling, Smith did not attend any of the scheduled sessions.

We are mindful of the difficulty Smith experienced in obtaining transportation. However, the record reflects that she failed to attend an appointment with a parenting counselor even when it was scheduled in her own home. In addition, the Department offered Smith transportation for many of the services, including the psychological evaluation and drug and alcohol assessments, but Smith completed only part of her psychological evaluation and none of the drug and alcohol assessments. Smith also missed many services because she was on the run from authorities or in jail.

Given this evidence, the trial court could reasonably have found that Smith's demonstrated lack of cooperation with the Department, failure to complete services that she knew were required in order to obtain the return of her child, and inability to complete some services due to evading law enforcement and incarceration, weighed in favor of a finding that termination of the parent-child relationship was in the best interest of the child.

We now turn to evidence bearing directly on the second prong of the statutory test, the best interest of the child. Smith first argues that she provided K.N.S. a stable home in Smith's father's house or her mother's house until K.N.S. was removed from her care. Smith's mother, father, and the father's girlfriend all testified that Smith was a good mother and that she was the primary caretaker of K.N.S. when she lived in their homes. Both of Smith's parents testified that they would be willing to support Smith and K.N.S. financially and allow them to live in their homes. At the time of trial, Smith had been living with her mother for approximately two weeks. She

10

testified that she and her mother were getting along well and that she would do anything necessary to have K.N.S. returned to her. From K.N.S.'s birth in January 2002 until the time of trial, Smith remained unemployed except for a one-month stint at a fast-food restaurant. At trial, she testified that she remained completely dependent on either her mother or father for financial support and living arrangements, but that she planned to go back to school and obtain employment.

While we acknowledge both Smith's undoubted love for her child and her family's testimony that she was a competent care-giver when she was with the child, the trial court was entitled to find that this evidence was outweighed by evidence of a history of violence and instability in Smith's life that could be detrimental to K.N.S.'s safety. Even when under court order to remain in her father's home, Smith was reported as a runaway several times. In one instance, she left K.N.S. behind without ensuring that her father and his girlfriend were available to take care of the child. Before K.N.S. was born, Smith was reported as a runaway five times and charged with assault six times, including incidents of violence against her mother. After K.N.S. was removed from Smith's custody, Smith continued to engage in physical altercations with both her mother and father. Smith was arrested and placed in a juvenile facility, ran away from the facility, and was arrested twice more, once for outstanding warrants and once for forging a check. Throughout this period, Smith twice evaded arrest by running away from her father's home for significant periods of time. Smith admitted that she and a friend stole a purse and each forged a check, and she indicated at trial that she planned to plead guilty to the felony charge. At the time of trial, Smith remained unemployed and completely dependent on her parents, in whose homes she had shown an inability to remain for any significant period of time, and with whom she exhibited a pattern of physically violent behavior.

11

We recognize that the upheaval in Smith's family life may not be wholly of her making. She did not have the family support needed to provide an appropriate home for her child. We also acknowledge that Smith expressed a desire to turn her life around and to avoid making the same mistakes she had made in the past. However, in considering the best interest of the child, evidence of a recent turn-around in behavior by the parent does not totally offset evidence of a pattern of instability and harmful behavior in the past. *See In re M.G.D.*, 108 S.W.3d 508, 513-14 (Tex. App.—Houston [14th Dist.] 2003, pet. denied). In addition, the trial court was required to focus on the best interest of the child. The court was presented with evidence showing that Smith had an unstable, violent family life, and that she had no means to lift herself and her child out of that life in the foreseeable future. The court could reasonably have formed a firm belief that Smith's past behavior indicated that she did not have the skills necessary to provide a stable, safe home for K.N.S. in the future.

Smith also argues that there is no evidence that K.N.S. suffered any physical or emotional harm as a result of Smith's behavior. However, in determining whether a child has been endangered by a parent's conduct, it is not necessary that the conduct be directed at the child or that the child actually suffer injury. *In re M.C.*, 917 S.W.2d 268, 269 (Tex. 1996); In *re C.L.C.*, 119 S.W.3d 382, 392 (Tex. App.—Tyler 2003, no pet.). It is sufficient that the child's well-being be jeopardized or that the child be exposed to loss or injury. *C.L.C.*, 119 S.W.3d at 392. A parent's violent conduct can produce an environment that endangers the physical or emotional well-being of a child. *Id*. at 392-93. Moreover, conduct that routinely subjects a child to the probability that the child will be left alone because her parent is jailed endangers both the physical and emotional well-

12

being of the child. *Id.* at 393; *In re S.D.*, 980 S.W.2d 758, 763 (Tex. App.—San Antonio 1998, pet. denied).

Although there was no evidence that K.N.S. suffered any physical harm as a result of Smith's conduct, evidence showed that Smith demonstrated a pattern of violent fights with her family, continuing illegal behavior, and running away. The court could have reasonably viewed this evidence as endangering the physical and emotional well-being of K.N.S. In addition to her pattern of chaotic family relationships, Smith testified that she allowed both her son and K.N.S. to be in the company of her son's father, an alleged sex offender. Even when Smith was under court order to remain in her father's home after K.N.S. was born, Smith continued to run away with K.N.S. and stay in friends' homes. When K.N.S. was approximately seven months old, Smith ran away from her father's house without K.N.S. and did not return for three days. She left the home without ensuring that her father or his girlfriend could take care of K.N.S. and without telling them where she was going or when she would return. After K.N.S. was removed from Smith's custody, Smith continued to engage in criminal conduct that made her susceptible to arrest and jail time. She was arrested in June 2003 for assault after she brandished a knife at her father during a physical altercation. After the Juvenile Probation Department placed Smith in a juvenile facility, she went on the run from authorities for four months. Smith was arrested again in November 2003 for outstanding warrants, at which time she was interrogated regarding her involvement in the theft of a purse and forgery of a check. Smith confessed to both charges. When Smith was given the opportunity to turn herself in for the theft and forgery, she ran away yet again in an attempt to evade arrest. She was eventually arrested and incarcerated in the county jail. At the time of trial, the felony

13

forgery charge was still pending. In evaluating this evidence, the court reasonably could have formed a firm belief that Smith's behavior created such instability and uncertainty that it placed K.N.S. in danger of physical and emotional harm, and that returning K.N.S. to Smith's custody could cause future physical and emotional damage to the child.

Smith also contends that her youth at the time she became a mother should be taken into consideration in determining the best interest of the child. Smith was 15 years old at the time K.N.S. was born. However, the statute setting forth grounds for termination does not provide any exceptions for minor parents. *See* Tex. Fam. Code Ann. § 161.001 (West 2002). Furthermore, we have found no precedent in the case law for granting a minor parent a special status in parental termination cases. In addition, in determining best interest of the child, a court should focus on the interest of the child, not the needs or desires of the parent. *See Brice*, 135 S.W.3d at 160. Nevertheless, we recognize that Smith's youth may have contributed to her inability to provide a stable home for K.N.S. The record shows that Smith did not have the family and financial support necessary to raise her child in a stable environment and that she did not have skills with which to support her child financially on her own. However, Smith essentially asked the court to disregard her past mistakes and look only at the plans she has for her future. Despite the support offered by her parents, her future plans are too uncertain to require the court to find that she can provide stability and financial support for K.N.S. The record indicates that K.N.S. is happy with the Harpers and that she thinks of them as her mother and father. The Harpers have consistently provided a stable environment for her since she was less than a year old, and they have stated a desire to adopt her.

The record also indicates that Smith acknowledged that she made many mistakes in providing for K.N.S., and we infer from her testimony that she recognized that it may be in K.N.S.'s best interest not to be returned permanently to Smith and her family. Smith testified that rather than terminating her parental rights, it would be in K.N.S.'s best interest to continue to have visitations with Smith while remaining in foster care. However, the Department caseworker testified that allowing K.N.S. to remain in foster care until she turned eighteen would leave her "in limbo" and that it would generally be unlikely that a child of K.N.S.'s age would remain in the same foster family until the age of eighteen without being adopted. In determining the best interest of K.N.S., the court was entitled to consider that such an arrangement would leave K.N.S. in a permanent state of uncertainty, as she would not be returned to Smith but would also not be available for adoption. *See M.G.D.*, 108 S.W.3d at 515 (finding that keeping child in foster care indefinitely leaves child "in limbo"); *In re M.N.G.*, 147 S.W.3d 521, 540 (Tex. App.—Fort Worth 2004, pet. filed) (finding that caseworker's testimony that leaving child in foster care until age eighteen created instability for child weighed in favor of finding that termination of parental rights was in best interest of child). The court was also entitled to consider that Smith could not show that she had a job or adequate skills for employment, and she could not offer an appropriate support system for the child. Presented with the alternatives, the court reasonably could have formed a firm belief or conviction that termination of Smith's parental rights was in the best interest of K.N.S.

Although evidence indicated that Smith loved her daughter and wanted to be able to provide a stable home for her, other evidence showed that Smith failed to cooperate with the Department in order to comply with her court order; that she was completely dependent on her

parents, with whom she had an unstable, violent relationship; that she routinely ran away when confronted with problems; and that she continued to engage in criminal behavior likely to result in arrest and jail time. The record also indicated that K.N.S. was happy with her foster family and that her foster parents would likely adopt her. Faced with such evidence, the trial court could reasonably have formed a firm conviction that termination of Smith's parental rights was in the best interest of K.N.S.

## CONCLUSION

The evidence in this case was legally and factually sufficient to support the court's conclusion that termination of Smith's parental rights was in the best interest of the child, K.N.S. We affirm the order of the trial court terminating the parent-child relationship.


_____

_____ Bea Ann Smith, Justice

Before Chief Justice Law, Justices B. A. Smith and Pemberton

Affirmed

Filed: March 10, 2005

16