# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-05-00116-CV

**Jeremy David Clawson, Appellant**

**v.**

**Texas Department of Protective and Regulatory Services, Appellee**

### FROM THE DISTRICT COURT OF MILAM COUNTY, 20TH JUDICIAL DISTRICT
### NO. 28,968, HONORABLE EDWARD P. MAGRE, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

Jeremy David Clawson appeals from the district court's order terminating his parental rights to A.F.C. and J.D.L.C. Clawson challenges the legal and factual sufficiency of the evidence supporting the district court's findings that (1) he knowingly placed or allowed his children to remain in conditions or surroundings endangering the physical or emotional well-being of the children; (2) he engaged in conduct endangering the physical and emotional well-being of the children; and (3) termination of the parent-child relationship was in the children's best interest. Tex. Fam. Code Ann. § 161.001(1)(D), (1)(E), (2) (West 2005). We hold that the evidence was both legally and factually sufficient and affirm the district court's order of termination.

## BACKGROUND

Clawson is the biological father of A.F.C., born February 2002, and J.D.L.C., born July 2003, who are the subjects of this appeal. Clawson moved into a house in Milam County with his children and their mother, Danyle Aldridge, in late September 2003. There was a report of physical neglect concerning the children, and the Texas Department of Protective and Regulatory Services ("Department") began an investigation on September 26, 2003.

On October 1, 2003, a neighbor observed Clawson and Aldridge having a heated argument. According to the neighbor, Aldridge stood in the driveway holding the infant J.D.L.C. in her arms while Clawson edged his car towards her, revving his engine and blocking her path in the driveway. The neighbor called and alerted her husband, Sheriff's Deputy Johnny Beathard. When Deputy Beathard arrived, Clawson ceased this activity and drove down the driveway to his house. Deputy Beathard approached, ordered Clawson out of the vehicle at gunpoint and restrained him. Deputy Beathard spoke with Aldridge and noticed that A.F.C., who had been in the car with Clawson, had bruising on the side of her face and head. He arrested Clawson for endangering the child J.D.L.C., and took him to jail.[1] After taking Clawson into custody, Deputy Beathard contacted the Department and informed them of the incident.

The next morning Department caseworker Robert Hollis and Deputy Beathard arrived at the house. Hollis noted that the house smelled of decay, was cluttered, and had roaches in the kitchen sink. He also observed that a back room had trash on the floor, including a can of insecticide and a bottle of ether. Aldridge stated to Hollis that the owners had recently moved out of that room

---

[1] Clawson had been on parole for a 1999 burglary. Upon his arrest, his parole was revoked and his five-year sentence reinstated.

and left the trash. At trial Clawson claimed that he had not removed the items because he did not want the owners to accuse him of stealing anything.

Hollis the bruise on the side of A.F.C.'s head and took the children to the hospital for examination. The examining nurse testified that the injury to A.F.C. appeared to be in the outline of a hand and included bruising to the cartilage of her ear. She also noted that A.F.C. had a laceration on the inside of her lip and what appeared to be a cigarette burn on one of her fingers. Hollis and Deputy Beathard confronted Clawson later that day, and he confessed to striking A.F.C. and causing the injury to the side of her head.

Clawson was ultimately charged with two felonies, injury to a child (A.F.C.), and endangering a child (J.D.L.C.). He pled guilty to both and was sentenced to two years' imprisonment. While in prison, Clawson wrote several times to his children and sent them birthday greetings and gifts. He also enrolled in parenting and anger management courses. Clawson was scheduled to be released on September 30, 2005.

The Department petitioned for temporary conservatorship of the children. They recommended a permanency plan to reunite Aldridge with her children be established and that Clawson's parental rights be terminated. The permanency plan required Aldridge to attend parenting classes and anger management counseling, obtain steady employment and maintain housing free from safety hazards. Aldridge had only mixed success with the requirements of the plan. While she usually visited her children and completed some counseling, her employment was very unsteady. She also moved often and never provided the Department with any proof of safe and acceptable housing.

On March 3, 2004, the Department changed the plan's goal from reunification with Aldridge to termination and permanent adoption. The Department sent notice to Clawson in prison, and he submitted his mother, Lorelei Lander, as a candidate for possible placement. The Department contacted Lander, but she stated that she was unable to take the children at that time.

A trial was held on January 10, 2005. Towards the end of the trial, Aldridge voluntarily relinquished her parental rights to the children. Clawson, however, sought to preserve his parental rights. He asked that he be given a similar opportunity as Aldridge and that the court allow him time after his release to demonstrate that he could provide a stable environment for his children.

After hearing the arguments at trial, the district court terminated Clawson's parental rights, finding that clear and convincing evidence established that Clawson had knowingly placed or allowed his children to remain in conditions endangering their physical or emotional well-being, that he had engaged in conduct endangering his children's physical or emotional well-being, and that termination of his parental rights was in the best interest of the children. This appeal followed.

## DISCUSSION

In his sole point of error, Clawson complains that the evidence was both legally and factually insufficient to support the termination of his parental rights under section 161.001 of the family code. We disagree.

The permanent termination of parental rights is governed by a two-prong test. The Department must demonstrate, by clear and convincing evidence, both (1) that Clawson's parental conduct satisfies one of the statutory grounds for termination, and (2) that the termination of

Clawson's parental rights is in the best interests of the children. *See* Tex. Fam. Code Ann. § 161.001 (West 2005).

Divestment of parental rights is a grave and drastic remedy, and due process requires that clear and convincing evidence establish the requirements for termination. *In re C.H.*, 89 S.W.3d 17, 23 (Tex. 2002) (citing *In re G.M.,* 596 S.W.2d 846, 847 (Tex. 1980)); *Smith v. Texas Dep't of Protective & Regulatory Servs.*, 160 S.W.3d 673, 678 (Tex. App.—Austin 2005, no pet.). This evidence must possess the strength and breadth to "produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007 (West 2002); *In re C.H.*, 89 S.W.3d at 25.

Parents have a constitutional interest in the care and custody of their children, *Santosky v. Kramer*, 455 U.S. 745, 758 (1982). Because an order of termination finally and irrevocably divests the parent of all rights and duties to the child, termination proceedings should be strictly scrutinized. *In re J.R.*, 171 S.W.3d 558, 567 (Tex. App.—Houston [14th Dist.] 2005, no pet.) (citing *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985)). Similarly, involuntary termination statutes should be strictly construed in favor of the parent. *Id.* The rights of parents to their children are thus clearly compelling; however, they are not absolute. *C.H.*, 89 S.W.3d at 26. In termination proceedings, it is essential that courts not sacrifice the emotional and physical interests of the child merely to preserve the rights of the parent. *Id.*

A finding is legally sufficient in a termination case if, after viewing the evidence in a light most favorable to the decision, the appellate court concludes that the factfinder could reasonably have formed a firm belief or conviction that its findings were true. *In re J.F.C.*, 96

S.W.3d 256, 265-66 (Tex. 2002). The appellate court must "assume that the factfinder resolved disputed facts in favor of the finding if a reasonable factfinder could do so". *Id.* The reviewing court should therefore disregard evidence that the factfinder may have reasonably disbelieved or whose credibility may reasonably be doubted. *Id.*; *Smith*, 160 S.W.3d at 679. This standard gives the proper deference to the determinations of the factfinder. *Smith*, 160 S.W.3d at 679. However, in asking whether the factfinder could have reasonably formed a firm belief on the evidence, the appellate court must take account of all undisputed facts adverse to the finding. *Id.*

In factual sufficiency determinations, appellate courts must consider all relevant evidence in the record, whether it could be disbelieved by the factfinder or not. *J.F.C.,* 96 S.W.3d at 265-66. If, in weighing the evidence the factfinder could have reasonably resolved the conflicts to form a firm conviction that the allegations were true, then the evidence is factually sufficient and the termination findings must be upheld. *C.H.,* 89 S.W.3d at 18-19; *see also J.F.C.*, 96 S.W.3d at 265-66; *Smith*, 160 S.W.3d at 679. This is a departure from the traditional factual sufficiency review, which only requires that the weight of the evidence not be so against the result as to shock the conscience or appear manifestly unjust. *J.F.C.*, 96 S.W.3d at 264; *C.H.,*89 S.W.3d at 25; *Smith*, 160 S.W.3d at 679. The supreme court has held that such a standard is inadequate in parental rights termination cases, where findings must be based on clear and convincing evidence. *J.F.C.*, 96 S.W.3d at 264 (citing *C.H.,* 89 S.W.3d at 25); *Smith*, 160 S.W.3d at 679.

**Conduct Endangering the Physical or Mental Well-Being of the Child**

Clawson challenges the legal and factual sufficiency of the evidence supporting the termination of his parental rights relative to A.F.C. and J.D.L.C. He asserts that the evidence was

6

insufficient to establish that his conduct endangered the physical or emotional well-being of A.F.C. and J.D.L.C. because he did not cause serious bodily injury to either child.

The "conduct" endangering the child under section 161.001(1)(E) must be more than a single act or omission by the parent: "[A] voluntary, deliberate and conscious 'course of conduct' that endangered the child's physical and emotional well-being is required." *Williams v. Williams*, 150 S.W.3d 436, 450 (Tex. App.—Austin 2004, no pet.) (citing *Texas Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 534 (Tex. 1987)). "Endanger" means to expose to loss or injury or to jeopardize. *Boyd*, 727 S.W.2d at 533. The danger must constitute "more than the threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment," but it is not necessary that the endangering conduct be specifically directed at the child or even result in concrete physical or emotional injury. *In re M.C.*, 917 S.W.2d 268, 269 (Tex. 1996) (citing *Boyd,* 727 S.W.2d at 533)). Indeed, "violent acts and behavior directed at one child and at the child's mother in the presence of the other children" can also establish a course of conduct endangering a child's physical or emotional well-being. *In re J.C.*, 151 S.W.3d 284, 288 (Tex. App.—Texarkana 2004, no pet.); *Ziegler v. Tarrant County Child Welfare Unit*, 680 S.W.2d 674, 678 (Tex. App.—Fort Worth 1984, writ ref'd n.r.e.). Moreover, violent or negligent conduct directed against a child's siblings or parent may constitute endangerment, "even where the behavior was not committed in the child's presence." *J.C.*,151 S.W.3d at 289 (citing *Director of Dallas County Child Protective Servs. Unit of Tex. Dep.'t of Human Servs. v. Bowling*, 833 S.W.2d 730, 733 (Tex. App.—Dallas 1992, no writ).

Furthermore, "[i]ntentional criminal activity which expos[es] the parent to incarceration is relevant evidence tending to establish a course of conduct endangering the emotional and physical well being [sic] of the child." *In re A.W.T.*, 61 S.W.3d 87, 89 (Tex. App.—Amarillo 2001, no pet.); *Allred v. Harris County Child Welfare Unit*, 615 S.W.2d 803, 806 (Tex. App.—Houston [1st Dist.] 1980, writ ref'd n.r.e.). While imprisonment alone cannot establish a course of conduct endangering a child, it is a fact properly considered when assessing endangerment. *Boyd*, 727 S.W.2d at 533-34; *In re D.M.*, 58 S.W.3d 801, 812 (Tex. App.—Fort Worth 2001, no pet.); *In re D.T.*, 34 S.W.3d 625, 635-36 (Tex. App.—Fort Worth 2000, pet. denied). When all aggravating evidence, including the cause for imprisonment and any actual injury to the child, indicates a course of conduct endangering a child's physical or emotional well-being, then the requirements of section 161.001(E) have been met. *Boyd*, 727 S.W.2d. at 533-34.

Clawson misinterprets section 161.001(1)(E) when he states that it requires serious bodily injury to the child. Section 161.001(1)(E) focuses on the risk of both physical and emotional injury and does not require any actual injury to the child, let alone serious physical injury. It does, however, require that the parent's behavior constitutes a course of conduct endangering the child. *Boyd*, 727 S.W.2d at 534. A single act or omission is insufficient to satisfy section 161.001(1)(E).[2] *Id.*; *Williams,* 150 S.W.3d at 450.

There is evidence that Clawson engaged in a course of conduct endangering the physical or emotional well-being of his children. Clawson admitted to striking A.F.C. in anger after

---

[2] Serious bodily injury is required under section 161.001(1)(L), which allows termination after a single, discreet criminal act resulting in such injury. *See* Tex. Fam. Code Ann. § 161.001(1)(L).

she threw a dirty diaper at him and, as a result, was convicted for causing injury to a child. The nurse who examined A.F.C. stated that the mark on her head and face was in the shape of a handprint and that the blow must have been "of some force" to bruise the cartilage of the ear. The nurse also found that A.F.C. had a laceration on the inside of her lip, and a burn seemingly caused by a cigarette on her finger.

Clawson's conviction for endangering J.D.L.C. further establishes that he acted recklessly towards the safety of his children. According to Aldridge, Clawson attempted to prevent her from leaving with the children by blocking her path with his car. Aldridge testified that, as she was attempting to leave with J.D.L.C. in her arms, Clawson was using the car to "herd" her back towards the house. According to the neighbor, Aldridge appeared very upset and both parents were screaming at each other. Clawson also placed A.F.C. in the car with him, so she was present throughout this event. Thus, Clawson's reckless operation of a vehicle threatening his girlfriend and J.D.L.C., while A.F.C. was inside that vehicle, was conduct hazardous the emotional and physical well-being of both children. *J.C.*, 151 S.W.3d at 288 (holding that conduct endangering one child also endangers other children who are present); *Ziegler*, 680 S.W.2d at 678.

In addition, Aldridge testified that Clawson had engaged in assaultive behavior towards her and would hit her. She also testified that he was using drugs while they were together. While it is unclear from the record how often the children were present during abusive episodes, acting violently towards their mother is conduct that endangers children's physical and emotional well-being, in some circumstances even if the child is not present during the violence. *J.C.*,151 S.W.3d at 289 (citing *Bowling*, 833 S.W.2d at 733)).

9

There is also evidence that Clawson neglected to physically care for his children. When J.D.L.C. was examined at the hospital, the nurse found that the area behind his ears had not been cleaned, which was causing the skin to break down. She also noted a severe diaper rash, which likely resulted from his being left in a soaked diaper for an extended period. She further stated that both children were malodorous and needed baths. Although Clawson was in jail the night before the hospital exam, the condition behind J.D.L.C's ears and his rash could have persuaded the district court to believe that Clawson's conduct also included a pattern of physical neglect of his children's well-being.

Clawson claims that he is both committed to achieving a more stable life and that he desires to care for his children. However, Clawson's criminal conduct resulted in an extended period of incarceration that greatly destabilized the lives of his children. Clawson was on parole for a burglary charge when the events leading to the removal of the children took place. Therefore, he knew that criminal activity could result in immediate incarceration that would completely prevent him from caring for his children. Knowing this, Clawson committed two separate felonies: injury to a child and endangering a child. Thus, the district court was entitled to rely upon Clawson's incarceration *per se*, independently from the fact that his serious crimes were against his own children, in forming a reasonable and firm belief that Clawson's conduct endangered his children's emotional and physical well-being. *A.W.T.*, 61 S.W.3d at 89; *Allred*, 615 S.W.2d at 806.

Considering the evidence in the light most favorable to the ruling, we find that a reasonable factfinder could have formed a firm belief or conviction that Clawson engaged in a course of conduct that posed emotional and physical dangers to his children. *J.F.C.*, 96 S.W.3d at 265-66.

10

Therefore, the evidence is legally sufficient to support the district court's finding that Clawson engaged in conduct endangering the physical or emotional well-being of his children.

In terms of factual sufficiency, there is little conflicting evidence calling Clawson's course of conduct into question. While there was some controversy at trial as to how close he came to Aldridge and J.D.L.C. with the car, he pled guilty to the felony of endangerment of a child. He also forcefully struck A.F.C. and was convicted of injury to a child. Aldridge's testimony that Clawson was abusive towards her is uncontested. When Clawson was taken into jail on the evening of October 1, 2003, the poor conditions of his house and children strongly suggested that he did not properly care for them. Finally, his criminal actions violating his probation subjected him to immediate incarceration and made it impossible for him to provide for his children. Weighing all of the evidence concerning Clawson's behavior, we hold that the district court could have reasonably resolved any disputes to form a firm belief or conviction that his course of conduct endangered the physical or emotional well-being of his children. *C.H.*, 89 S.W.3d at 27-29.

We hold that there is legally and factually sufficient evidence supporting the district court's finding that Clawson engaged in conduct that endangered the physical or emotional well-being of his children. Tex. Fam. Code Ann. § 161.001(1)(E).[3] Therefore, the Department

---

[3] There is also significant evidence supporting the district court's finding that Clawson knowingly placed or allowed the children to remain in *conditions* endangering their physical or emotional well-being. Because a single finding under 161.001(1) is sufficient to satisfy the first prong for termination, we need not address this issue. *In re D.M.*, 58 S.W.3d 801, 813 (Tex. App.—Fort Worth 2001, no pet.); *In re S.F.*, 32 S.W.3d 318, 320 (Tex. App.—San Antonio 2000, no pet.).

demonstrated that Clawson's conduct satisfied the statutory grounds for termination required under section 161.001(1). *Id.*

**The Children's Best Interests**

There is a strong presumption that a child's interest is best served by preserving the conservatorship of the parents; however, this may be overcome by clear and convincing evidence to the contrary. *Williams*, 150 S.W.3d at 451; *D.M.*, 58 S.W.3d at 814. Several considerations are relevant to ascertaining a child's best interest, including, but not limited to (1) the desires of the child; (2) the current and future emotional and physical needs of the child; (3) the current and future emotional and physical dangers to the child; (4) the parental abilities of those seeking custody; (5) the programs available to assist those individuals in caring for the child; (6) the plans for the child by these individuals or the agency seeking custody; (7) the stability of the home or proposed placement; (8) any acts or omissions by the parent indicating that the existing parent-child relationship is improper; and (9) any excuse for the acts and omissions by the parent. *Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976).

A party seeking an involuntary termination of parental rights is not required to prove all nine *Holley* factors as a condition precedent to termination. *In re C.H.*, 89 S.W.3d at 27. The absence of evidence regarding some of the factors does not preclude the factfinder from reasonably forming a firm belief or conviction that termination is in a child's best interest, particularly if there is undisputed evidence that the parental relationship endangered the safety of the child. *Id.; Castorena v. Texas Dep't of Protective & Regulatory Servs.*, No. 03-02-00653-CV, 2004 Tex. App. LEXIS 3753, at *30 (Tex. App.—Austin April 29, 2004, no pet.) (mem. op.). Although finding that

12

Clawson engaged in conduct endangering the well-being of his children in no way relieves the court of independently determining what course of action is in each child's best interest, the same evidence can be probative on both issues. *Smith*, 160 S.W.3d at 679 (citing *C.H.*, 89 S.W.3d at 28).

While neither child was old enough to express a desire as to placement, considerations concerning their emotional and physical needs support the termination of Clawson's parental rights. *Holley*, 544 S.W.2d at 371-72. The social worker assigned to the children reported that they were doing well in their foster homes but were at an age where they required a more stable environment. She further testified that termination would allow the children to be considered for permanent adoption while they are still at an age that is easy to place. While she noted that their current foster homes did not plan to adopt them, she claimed that the children's youth, health, and good dispositions made them very good candidates for adoption. Aldridge was unable to care for the children and relinquished her rights. Clawson was not scheduled for release until several months after the trial, so any possible reunification with him would involve a substantial delay in achieving stability for his children.

Comparison of the emotional and physical dangers involved in terminating the parent-child relationship with those involved in allowing it to continue also indicates that termination is in the children's best interest. *Holley*, 544 S.W.2d at 371-72. J.D.L.C.'s foster mother testified that termination would not have a traumatic effect on him and that she doubted it would on A.F.C., with whom she also had contact. Clawson admitted that the children did not know him. Therefore, termination of his parental rights posed little or no threat to the emotional or physical well-being of the children. The same cannot be said for continuation of Clawson's parental rights. Due to his

13

incarceration, Clawson has been absent for most of his children's lives. They would have had to wait a minimum of eight months before beginning a relationship with him and much longer than that for him to complete the training necessary for reunification. If Clawson again exposed himself to incarceration, his children's lives would be further destabilized. Most importantly, we must note that Clawson's crimes were committed against his children. His incarceration was not due to a nonviolent offense but was rather the result of striking and injuring one child and endangering the other. While his absence has caused his children instability in their relationships, his presence could subject them to more serious dangers. A factfinder may infer that past conduct endangering the well-being of a child may be continued in the future. *De Llano v. Moran*, 160 Tex. 490, 333 S.W.2d 359, 361 (1960); *Castorena*, No. 03-02-00653-CV, 2004 Tex. App. LEXIS 3753, at *31-32; *May v. May*, 829 S.W.2d 373, 377 (Tex. App.—Corpus Christi, 1992, writ denied); *Davis v. Travis County Child Welfare Unit*, 564 S.W.2d 415, 421 (Tex. App.—Austin 1978, no writ); Considering the seriousness of his past behavior, it was possible that a relationship with Clawson still posed both physical and emotional dangers to his children.

Clawson attempted to demonstrate improved parental abilities. *Holley*, 544 S.W.2d at 371-72. While incarcerated, he enrolled in parenting and anger management courses and tried to maintain contact with his children by sending them letters and presents. At trial he demonstrated that he knew his children's birthdays, said that he loved them very much and pledged no future criminal activity. He stated that he wanted to be given the opportunity to show that he could care for his children. While we are sympathetic towards his situation, there was ample evidence before the district court indicating that Clawson did not possess adequate parenting skills. His lack of restraint,

14

evidenced by violence and recklessness towards his children, is disconcerting despite the parenting and anger management courses. His inability to provide financially for his children and failure to keep them in a clean environment before his incarceration also called into question his parenting abilities. While Clawson obviously made an effort to show improvement, his past conduct continued to cast significant doubt on his fitness as a parent. *Castorena*, No. 03-02-00653-CV, 2004 Tex. App. LEXIS 3753, at *31-32.

Clawson's proposed plan for the children was to place them with his mother, Lander, until he could establish a stable environment for them. *Holley*, 544 S.W.2d at 371-72. Lander had dependable employment as a grocery store manager and lived in a three-bedroom mobile home with her husband and another grandchild. When the Department contacted Lander in March of 2004, she stated that she did not want to be considered for placement. Lander failed to follow up on this possibility in any meaningful way prior to trial. At trial, she stated that her work schedule had now improved and that her daughter would be able to come to her house to care for the children after the daughter took her own child to school. Because Lander originally declined consideration, there had been no home study performed to gauge the suitability of the household for raising a young girl and infant boy. Therefore, the only evidence the district court had in favor of such a placement was the in-court testimony of Lander and Clawson. In addition, Lander stated that she did not at that time know the children because she had met A.F.C. only a few times and had never seen J.D.L.C.

Clawson's personal plans after release were unstable. Clawson stated that his trade was construction, but he was financially insolvent at the time his children were removed. He did not have any concrete plans for employment upon his release. He claimed that his father was to give him

a new mobile home, but he did not yet own a piece of property to put it on. Establishing a plan for stability is a problem for any parent convicted of a crime. However, the proper inquiry at this phase of the review concerns the best interests of the children, and it appeared that any stability Clawson might establish for them would be many months or years away.

Viewing the evidence in the light most favorable to the court's finding, we hold that the district court could form a reasonable and firm belief that termination of Clawson's parental rights was in the children's best interest. Therefore, we hold that the evidence is legally sufficient to support the order of termination. *J.F.C.*, 96 S.W.3d at 265-66.

We also hold that the evidence allowed the district court to form a reasonable and firm belief as to the children's best interest when viewed in a neutral light. The primary evidence weighing in Clawson's favor is that of the possible placement with Lander, allowing a continuation of his parental rights. While placement with Lander might have had potential when first suggested, ultimately there was little evidence supporting such a placement, and significant evidence suggesting that a future relationship with Clawson was not in the children's best interest. Therefore, we hold that the evidence is factually sufficient to support the order of termination. *C.H.*, 89 S.W.3d at 25

Clawson argues that, despite his past conduct, he should be given the same chance as the children's mother—an opportunity to demonstrate that he can provide a stable environment and adequately support his children once he is released. Under family code section 263.401(a), the court is required to make a final decision regarding termination of parental rights within one year of the granting of temporary conservatorship to the department, or with an extension, within one year and 180 days. Tex. Fam. Code Ann. § 263.401(a) (West 2005). The purpose of this particular time-

16

limit is to facilitate the creation of some permanence and stability in the children's lives. *In re L.J.S.*, 96 S.W.3d 692, 693 (Tex. App.—Amarillo 2003, pet denied).[4] The supreme court has also long held that "[j]ustice demands a speedy resolution of child custody and child support issues." *Proffer v. Yates*, 734 S.W.2d 671, 673 (Tex. 1987).

The Department was granted temporary conservatorship of the children on October 15, 2003. Pursuant to section 263.401(a), the district court was required make a final decision as to Clawson's parental rights one year and 180 days from that date. Therefore, in order to avoid dismissal, the district court had to make a final termination decision before Clawson's release from prison.

If the district court decided to allow Clawson's parental rights to continue, it would be unable to rely on Clawson's previous behavior to quickly remove the children from his care if it became concerned with their safety in the future. *In re T.M.*, 33 S.W.3d 341, 347-48 (Tex. App.—Amarillo 2000, no pet.); *In re Ruiz*, 16 S.W.3d 921, 927-28 (Tex. App.—Waco 2000, no pet.) (holding that the Department must allege new facts to temporarily remove a child from the home if the child had been previously removed). Additionally, the court's decision allowing continuation of his rights despite his actions would be a decision on the merits that would prevent the court from relying on Clawson's felonies against his children in a future termination suit. *Slatton v. Brazoria*

---

[4] The legislature established the deadline in section 263.401 in order to carry out the 1996 recommendation of the Governor's Committee to Promote Adoptions that, in the interest of the children, parental rights should be either terminated or reinstated within 12 months. *In re Ludwig*, 150 S.W.3d 819, 822 (Tex. App.—Austin 2004, no pet.); *In re Bishop*, 8 S.W.3d 412, 416-17 (Tex. App.—Waco 1999, no pet.). In the case of A.F.C. and J.D.L.C. an extension was granted, and the court named the final deadline for disposition as April 10, 2005, nearly a year and a half after the children were first removed.

*County Protective. Servs. Unit*, 804 S.W.2d 550, 552-53 (Tex. App.—Texarkana 1991, no writ) (res judicata applies in termination cases instituted by the State).

Clawson's treatment of his children necessitated the children's initial removal, and continuation of his rights would expose them to both continued instability and the risk of emotional and physical harm. While we are not unsympathetic to Clawson's request for time to demonstrate his parental fitness after his release, his inability to establish that he would provide a safe environment for his children is primarily due to his own incarceration. In light of these considerations, the district court properly found that a final termination was in the children's best interest.

**CONCLUSION**

Because we find the evidence legally and factually sufficient for the district court to reasonably form a firm belief or conviction that the grounds for termination were met and that termination of Clawson's parental rights was in the best interest of the children, we affirm the district court's order of termination.

_____

Bea Ann Smith, Justice

Before Justices B. A. Smith, Patterson and Pemberton

Affirmed

Filed: July 21, 2006

Do Not Publish