# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-05-00682-CV

**Melinda Shaw, Appellant**

**v.**

**Texas Department of Family and Protective Services, Appellee**

### FROM THE DISTRICT COURT OF TRAVIS COUNTY, 53RD JUDICIAL DISTRICT
### NO. FM4-06292, HONORABLE SUZANNE COVINGTON, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

The trial court signed a final decree terminating appellant Melinda Shaw's parental rights to her son, C.O., who was born on April 26, 2003.  While a juvenile, Shaw was adjudicated delinquent on multiple occasions for possession of marijuana, possession of cocaine, several counts of assault, and several counts of failure to identify.  The Department introduced evidence about her juvenile record at trial, and in her first issue, Shaw argues that the trial court erred in allowing the Department to introduce that evidence.  In her next eight issues, she argues that the evidence is legally and factually insufficient to support the trial court's findings that she placed or allowed C.O. to be placed in surroundings that endangered his well-being, placed him with persons who engaged in conduct that endangered his well-being, or failed to comply with a court order setting out conditions for C.O.'s return, or that termination was in C.O.'s best interest.  In her final issue, she

argues that the trial court erred in denying her motion for continuance. We affirm the trial court's decree of termination.[1]

## Factual Summary

Shaw was seventeen years old when she gave birth to C.O. in April 2003, while she was in TYC custody. He lived with her at a TYC facility for young mothers until her release in March 2004; Shaw was almost twenty at the time of trial. On September 17, 2004, she was arrested for attempted burglary of a habitation after she, her sister Erica, and their respective boyfriends went to get Erica's baby from the baby's father. Shaw left C.O. in the car while she and the other three went to the father's apartment. The father refused to give the baby to Erica, so Shaw and her companions kicked open the door, injuring him.[2] Shaw grabbed the baby and ran out of the apartment and was arrested before she could drive away. Unable to locate anyone to take care of C.O. after her arrest, the police sent him to a children's shelter, where an employee discovered a bag of marijuana in C.O.'s diaper.

The Department of Family and Protective Services was appointed C.O.'s temporary managing conservator in late September 2004. In orders issued in September and December 2004, the trial court required Shaw to complete a parenting class through Any Baby Can, a protective

---

[1] The trial court found that Shaw knowingly placed C.O. or allowed him to remain in conditions that endangered his well-being, engaged in conduct that endangered or knowingly placed him with someone who engaged in conduct that endangered him, and failed to comply with a court order. *See* Tex. Fam. Code Ann. § 161.001(1)(D), (E), (O) (West Supp. 2005).

[2] The police report said that Shaw participated in kicking down the door and assaulting the victim, but Shaw denied it. She testified that she ran to her car to call the police when the father would not open the door, and when she returned, the door had already been kicked down.

parenting class, an anger management class, and a drug and alcohol assessment, submit to a psychological evaluation, undergo drug testing three times a week, attend five Alcoholics Anonymous or Narcotics Anonymous ("AA" or "NA") meetings a week, and maintain safe and stable housing and employment. Shaw remained in prison for about a month after her arrest and then was given deferred adjudication and placed on community supervision. In 2005, Shaw pled no contest to a charge of theft by check and was imprisoned from February through April 2005, when she was released on probation. Her community supervision and probation terms required her to submit to drug testing, undergo drug treatment, attend three AA or NA meetings a week, take parenting classes, work towards a high school diploma, and find and maintain employment.

Amy Slayton, one of the caseworkers assigned to Shaw's case, testified that until February 2005, Shaw did not make progress on the court's orders "except perhaps sign her release of information." Shaw missed several visits with C.O., was kicked out of anger management and parenting classes for poor attendance, missed a scheduled psychological evaluation, and never complied with Department-requested drug testing. Shaw agreed and said that when C.O. was first taken from her, she was depressed and felt sorry for herself. After her release from prison in April 2005, she "decided to get it together" and began to comply with the court's order.

Shaw testified that she started smoking marijuana when she was twelve or thirteen and had not used any other kind of drug. She began attending AA and NA meetings in late July 2005, less than two months before trial, but said, "I don't think I have a drug problem, but I just chose—I just chose to smoke as a result of my emotions." She explained, "Like when I get depressed, I think smoking eases the pain, and that's not correct. So I just—I could stop any time

3

I want to, and I decided to stop." She said she had last used marijuana before she was incarcerated in February 2005, and her probation drug tests in April, May, July, and August 2005 were negative. However, her probation officer testified that test results from the week before trial were positive for marijuana and that Shaw was upset about those results and said she had not smoked any marijuana but might have "been around someone who does." Shaw was ordered to re-test the next day, but did not come in for that test. The Department also argued that Shaw's drug tests taken for her probation officer did not satisfy the Department's requests for drug testing.[3]

In October 2004, Shaw was kicked out of a parenting class for failure to attend. She contacted the Department in April 2005, and rescheduled the parenting class for mid-May, but was again discharged for non-attendance because she did not have transportation. She successfully completed parenting classes in the summer of 2005, receiving a certificate of completion in early September. Shaw started anger management classes in June 2005, but was discharged after she missed two classes because of work, and she missed a December 2004 appointment for a court-ordered psychological evaluation. The evaluation was rescheduled for March 2005, when she was in jail, and she completed the evaluation in May 2005.

---

[3] The Department argued that Shaw's monthly drug tests for her probation did not satisfy the court's order of random drug testing in this case. Shaw testified, however, that she was told she did not have to do the court-ordered weekly drug tests because she was taking drug tests for her probation. Amy Slayton, Shaw's Department caseworker, testified that she asked Shaw to submit to drug testing. Slayton told Shaw that if she provided proof of her probation drug tests, "then [Slayton] probably would not be asking as many times, but [Slayton] did reserve the right to still request random" tests; Slayton said Shaw never provided proof of drug tests taken through the probation office.

Russell Oldaker, C.O.'s father and Shaw's ex-boyfriend, testified that he had a history of domestic violence against the mother of his older child, he was arrested several times for assaulting her, and she obtained a protective order against him. After Shaw's release from TYC in March 2004, she and C.O. moved in with Oldaker. In June 2004, Oldaker assaulted Shaw, pushing her to the ground, hitting her, and locking her in a closet. Shaw called the police and obtained an emergency protective order against Oldaker, but after her release from prison in April 2005, she reunited with him and lived with him until July 2005. In June 2005, Shaw's probation officer saw bruises on Shaw, and Shaw said that "she'd had an abusive boyfriend and she had left him." The officer did not think Shaw was referring to Oldaker.

At the time of trial, Shaw was moving around, sometimes staying with her grandmother or her sister and, although they were no longer a couple, sometimes staying in motel rooms with Oldaker. Asked what she would do if C.O. was returned to her care, she said, "I'm in the process of looking for an apartment right now, so we would have an apartment. If not, he's always welcome to come to my grandma's house, just like I am." Before being incarcerated in 2005, Shaw worked at a fast food restaurant for a "couple of months." About a month and a half before trial, Shaw worked at a Denny's restaurant for a "couple of weeks," but she left because she had to go to her court-ordered classes and her manager felt she was not dedicated to her job. She testified that her anger management classes and scheduled visits with C.O. conflicted with her work hours and that she tried unsuccessfully to contact the Department about rescheduling her visits. She was not employed at the time of trial, but was looking for a job and was going to start taking a class about job searches and resume preparation through her probation office. She agreed that she had "trouble

5

with authority figures" and acted before or without thinking, admitting that during a break in trial the day before, she called the Department's attorney a "stupid bitch" because she was angry and frustrated. Shaw said she loves C.O., believes she can care for him with the skills she has learned, and will never act rashly toward C.O. or call him names if frustrated.

Shaw was allowed to have supervised visitation with C.O. once a week, but admitted that she missed several visits, usually because she had difficulty arranging transportation. According to Department records, Shaw did not visit C.O. between January 11 and May 18, 2005; she was incarcerated from February 15 until April 23. Shaw testified that after her release in April, Oldaker tried to arrange for visitation and was told that he and Shaw would first have to attend a "meeting about services." Shaw did not call the Department herself and relied on Oldaker. Shaw and Oldaker eventually met with the Department in mid-May.

Dr. William Dubin conducted a psychological evaluation of Shaw in May 2005. She told Dubin that she had been abused and molested during her childhood and that she ran away from her grandmother's house and foster homes several times. She told Dubin that "she uses marijuana 'to help me relieve stress,'" but denied using alcohol or other illegal drugs. She said that she used marijuana almost daily after C.O. was removed until February 2005 "to help her reduce stress and that the removal itself was a stressor," but she did not believe she had a substance abuse problem. Dubin determined that she "met the diagnostic criteria of anti-social personality disorder," had an anxiety disorder, marijuana dependence, and borderline intellectual functioning. Asked about her ability to care for a child, Dubin answered, "That's the problem, is that the poor judgment, both the anti-social issues and the intellectual issues make it problematic for her to provide a safe

6

environment for the child." Regarding Shaw's relationship with her child, he said "her lie score was so high, it made the test . . . uninterpretable." He thought there was "good bonding" with C.O., but he could not be sure.

Amy Slayton, Shaw's caseworker, testified that she had seen a worrisome pattern of behavior by Shaw. Slayton testified that at the time she was assigned to the case in February 2005, she did not think Shaw had complied with the court's orders "except perhaps [to] sign her release of information." Shaw had missed a scheduled psychological evaluation and had not completed any drug tests or participated in parenting or anger management classes. Shaw did not visit C.O. or contact the Department between January 11 and April 26, when Oldaker tried to try to arrange visitation for himself and Shaw. Slayton arranged a meeting for the next day, but Shaw did not attend and Oldaker was thirty minutes late. Slayton rescheduled the meeting for May 4, but neither Shaw nor Oldaker appeared. Slayton rescheduled again for May 11, confirming the new date with Oldaker by phone and by letter; Oldaker attended, but Shaw did not. Slayton did not recall that Shaw attempted to contact her by letter or phone between April 26 and May 18, when she finally met to discuss her progress under the Department's reunification plan. Shaw missed the next week's visitation, but met with Slayton again on May 31.

Slayton did not believe Shaw had "taken any responsibility for the situation or the reasons that [C.O.] was brought into the Department's care," and testified that she believed termination and adoption were in C.O.'s best interest. She said, "I feel it's in his best interest to be adopted because there has not been any significant progress by the parents. There hasn't been any significant change in their lifestyle that led to the Department being involved in the first place. There

is a lack of responsibility, I feel, on the parents' part to acknowledge the problems that exist in this case. There's been a lack of participation in services, a lack of contact with their child. And [C.O.] needs permanency." Slayton believed that C.O. had become more trusting and outgoing while in foster care, and his speech had improved through speech therapy. Slayton believed that Shaw had endangered C.O. "by continuing to be involved with someone who has a criminal history, herself having a criminal history and continuing with that criminal history throughout the life of our case, not having a stable home to live in, not having stable employment[,] . . . [l]iving in motels, clearly not having anything stable for him and not making any significant changes." Slayton summarized her opinion, saying C.O. had been in foster care for almost a year and "deserves permanency and . . . Ms. Shaw has not made any significant progress in her services. I don't feel that she's made any significant efforts to change her lifestyle or to acknowledge the problems that brought the Department . . . into her life."

Carolyn Hansen, the court-appointed representative for C.O., testified that she had been working on the case since November 2004. She believed that C.O. needed loving parents who were active and could give him the attention he craves. Hansen observed many of Shaw's visits with C.O., and testified that Shaw does not really play with C.O. and instead "gives him orders." She did not believe Shaw was using any skills she had learned in her parenting classes, saying, "He plays with a toy, she'll grab it and say 'Mine,' and she pulls it away from him. And she waits until he cries before she'll hand it back to him." Hansen said "there just is not a relationship, in my opinion." She also testified that she had heard Shaw tell C.O. that his father, Oldaker, was "a sorry dad" or a "no good dad." Hansen believed that C.O. was very adoptable and testified that he was happy and

8

thriving in his current foster home and that his speech had improved greatly since his removal. Asked whether permanency was important for C.O., she said it was, explaining, "He's having that now and you can see how well emotionally and educationally that he's doing with the speech, with his affection for other people, how he gets along, how he plays with other children." Hansen did not believe Shaw should be given more time to obtain services because "it would hurt" C.O. Hansen believed Shaw had been "dilly-dallying" with satisfying the court order and said she once asked Shaw why she was not making efforts to meet the court's requirements. Shaw said, "Well, nobody's made any appointments," and Hansen told her to contact her case worker and to "[g]et it going if you want him," but Shaw "just sort of ignored" her. Hansen did not think that Shaw's visits with C.O. had improved since November 2004, and in fact she thought "they have gone downhill."

## Sufficiency of the Evidence

Even if we assume that it was error to admit evidence about Shaw's juvenile record and disregard that evidence, the record is legally and factually sufficient to support the trial court's termination of her parental rights. Therefore, we need not decide whether a juvenile's criminal records may be used in a termination case such as this one.

A parent's rights to her child may be terminated only if the trial court finds (1) she has engaged in conduct set out as statutory grounds for termination, and (2) termination is in the child's best interest. Tex. Fam. Code Ann. § 161.001 (West Supp. 2005); *In re C.H.*, 89 S.W.3d 17, 23 (Tex. 2002). The Department must prove those elements by clear and convincing evidence, which is evidence that "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations" supporting termination. *C.H.*, 89 S.W.3d at 23 (quoting *State v.*

9

*Addington*, 588 S.W.2d 569, 570 (Tex. 1979)).  In reviewing the legal sufficiency of the evidence, we consider all of the evidence in the light most favorable to the trial court's finding and ask whether a reasonable fact-finder could have formed a firm belief or conviction that the finding was true.  *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002).  In a factual sufficiency review, we consider all of the evidence and ask whether a reasonable fact-finder could have resolved any evidentiary disputes in favor of a finding that the State's allegations are true.  *Id*.  We must maintain appropriate deference to the trial court's role as fact-finder by assuming that it resolved evidentiary conflicts in favor of its finding when reasonable to do so and by disregarding evidence that it reasonably could have disbelieved.  *Id*. at 266-67.

In determining a child's best interests, we consider factors such as: the child's emotional and physical needs now and in the future; emotional or physical danger to the child now and in the future; the parenting abilities of the parties seeking custody; programs available to help those parties; plans for the child by the parties seeking custody; the stability of the proposed placement; the parent's conduct indicating that the parent-child relationship is improper; and any excuses for the parent's conduct.  *Holley v. Adams*, 544 S.W.2d 367, 372 (Tex. 1976).  The Department need not prove all nine *Holley* factors, and the absence of some of those factors does not bar a finding that termination is in the child's best interest, especially in the face of undisputed evidence that the parental relationship endangered the child.  *C.H.*, 89 S.W.3d at 27.  No one factor is controlling, and evidence of one factor may be sufficient to support a finding that termination is in the child's best interest.  *In re J.O.C.*, 47 S.W.3d 108, 115 (Tex. App.—Waco 2001, no pet.).  Parental conduct giving rise to grounds for termination under section 161.001 is often intertwined

10

with the best interest determination. *See Horvatich v. Texas Dep't of Protective & Regulatory Servs.*, 78 S.W.3d 594, 601 (Tex. App.—Austin 2002, no pet.); *In re D.M.*, 58 S.W.3d 801, 814 (Tex. App.—Fort Worth 2001, no pet.). However, the best-interest determination generally "must have a firm basis in facts standing apart from the offending behavior." *D.M.*, 58 S.W.3d at 814; *see Horvatich*, 78 S.W.3d at 601. Permanence is of paramount importance in considering a child's emotional and physical needs. *In re T.D.C.*, 91 S.W.3d 865, 873 (Tex. App.—Fort Worth 2002, pet. denied); *In re M.A.N.M.*, 75 S.W.3d 73, 77 (Tex. App.—San Antonio 2002, no pet.); *see Lehman v. Lycoming County Children's Servs. Agency*, 458 U.S. 502, 513 (1982) (children need stable, long-term relationships with caretakers). A fact-finder may consider the possible consequences of a decision not to terminate and may compare the parent's and the Department's plans for the child. *See D.O. v. Texas Dep't of Human Servs.*, 851 S.W.2d 351, 358 (Tex. App.—Austin 1993, no writ).

The trial court found that Shaw knowingly placed C.O. or allowed him to remain in conditions that endangered his well-being, engaged in conduct that endangered or knowingly placed him with someone who engaged in conduct that endangered him, and failed to comply with a court order. *See* Tex. Fam. Code Ann. § 161.001(1)(D), (E), (O). If the evidence is sufficient to support any one of those grounds and a finding that termination is in the child's best interest, we will sustain the trial court's termination decree. *See In re M.C.M.*, 57 S.W.3d 27, 32 (Tex. App.—Houston [1st Dist.] 2001, pet. denied).

After C.O. was removed from her care in September 2004, Shaw was ordered to participate in parenting and anger management classes, undergo a psychological evaulation, and submit to random drug testing. After a status hearing in December, she was ordered to complete a

psychological exam, complete twelve parenting classes at Any Baby Can, complete protective parenting classes, complete a drug and alcohol assessment and follow all recommendations, submit to random drug testing three times a week, attend five AA or NA meetings a week, and obtain and maintain stable and safe housing and employment. Shaw did not begin to attempt to comply with either court order in any real sense until her release from prison in late April 2005, more than six months after C.O. was removed. Shortly before trial, Shaw completed one parenting class, she completed her psychological evaluation in May, and she began attending AA meetings in July. She had not, however, submitted to the Department's requests for drug testing or taken the ordered protective parenting class; she attempted to enroll in that class during trial, but the class was full. Nor had she completed the ordered anger management class; she attended two of those classes in June and early July and then was discharged after she missed three classes. The week before trial she tested positive for marijuana, after having negative test results through her probation officer for several months. She had not yet started the drug treatment program ordered by the terms of her probation. She did not have stable housing and was moving around between staying at her grandmother's home, with friends, or in motel rooms with Oldaker. She had recently been hired at a restaurant but had not started work yet. About a month and a half before trial, she left her former job, where she worked for several weeks, and before that, she had another job for a short period of time. She brought C.O. with her to the scene of the assault and burglary leading to her arrest and his removal, admitted to using marijuana in the past, and pled no contest to charges of theft that led to her incarceration for several months in early 2005.

Based on this record, there was both legally and factually sufficient evidence on which the trial court could find that, despite her recent efforts, Shaw had failed to comply with the court orders that established requirements for C.O.'s return by failing to complete the anger management or protective parenting classes and by failing to submit to Department-ordered drug testing. The court could also have considered that she made no effort to comply with the orders until about eight months after C.O.'s removal and that she tested positive for marijuana shortly before trial. Further, the evidence supports a finding that Shaw engaged in conduct that endangered C.O. by bringing him to the scene of a crime, engaging in other criminal conduct that led to her 2005 imprisonment, and continuing to stay with a man who had been physically abusive in the recent past.

As for the best-interest finding, both Slayton and Hansen testified that they believed termination was in C.O.'s best interest. They explained that his speech development has improved and that he has been thriving in a stable, secure, and loving foster home. Hansen believed that C.O. was very adoptable and said he had become more trusting, affectionate, and outgoing since his removal from Shaw. Hansen and Slayton testified that C.O. needed permanency, which would be best accomplished through adoption. Although Shaw had recently begun to make progress on the court's orders and testified that she loved C.O. and believed she could be a good parent with the skills she had been learning, Slayton and Hansen believed that Shaw had not made significant progress in her parenting skills or her compliance with the court orders. Although Shaw testified that she had just found a job and that she was seeking an apartment, in the year since C.O.'s removal, she had not found stable employment or housing. Further, Slayton did not believe Shaw had taken responsibility for the circumstances that led to C.O.'s removal or that she had achieved any stability

13

or made significant changes in her lifestyle. Dr. Dubin opined that Shaw had an unacknowledged marijuana dependence and was concerned that her poor judgment, anti-social personality disorder, and "intellectual issues" made it "problematic for her to provide a safe environment" for C.O. Based on this record, the evidence is both legally and factually sufficient to show that termination is in C.O.'s best interest. *See Smith v. Texas Dep't of Protective & Regulatory Servs.*, 160 S.W.3d 673, 681 (Tex. App.—Austin 2005, no pet.) ("in considering the best interest of the child, evidence of a recent turn-around in behavior by the parent does not totally offset evidence of a pattern of instability and harmful behavior in the past").

The evidence is legally and factually sufficient to support at least one of the statutory grounds for termination, and we therefore overrule Shaw's second, third, fourth, sixth, seventh, and eighth issues on appeal. The evidence further supports the finding that termination is in C.O.'s best interest, and we thus overrule her fifth and ninth issues. Because the evidence is legally and factually sufficient to support those findings without any reference to Shaw's juvenile records, we need not consider her first issue.

**Motion for Continuance**

Shaw sought a continuance of the September 2005 bench trial, arguing that the one-year deadline imposed by the family code, *see* Tex. Fam. Code Ann. § 263.401 (West Supp. 2005), should be extended because Shaw had begun to make progress under the court's orders. The Department and C.O.'s guardian ad litem objected to the request for a continuance, arguing that Shaw had not shown any extraordinary circumstances and that C.O. needed some permanence. The trial court denied Shaw's motion, and Shaw complains of that denial in her tenth issue on appeal.

14

The family code provides that unless the trial court has granted an extension, it must either render a final order or dismiss the Department's suit for termination "on the first Monday after the first anniversary of the date the court rendered a temporary order appointing the department as temporary managing conservator." *Id*. § 263.401(a). The trial court may grant up to a 180-day extension, but such an extension may only be granted if "the court finds that *extraordinary circumstances necessitate*" the Department's continuing temporary managing conservatorship and that continuing the Department's conservatorship is in the child's best interest. *Id*. § 263.401(b) (emphasis added).

We review a trial court's decision on a motion for continuance for an abuse of discretion. *In re T.T.*, 39 S.W.3d 355, 361 (Tex. App.—Houston [1st Dist.] 2001, no pet.). Shaw filed a motion arguing that she should be granted a four-month continuance to give her more time to take the protective parenting and anger management classes. The Department opposed the motion, arguing that Shaw had not shown extraordinary circumstances justifying a continuance and noting that Shaw had already been discharged from the protective parenting class due to absences twice and that she had not complied with the Department's drug testing requirements. C.O.'s attorney ad litem did not take a position on Shaw's motion, but stated that he thought "it's very unlikely that the situation is going to be different if we rescheduled it" and that the guardian ad litem "is very much opposed to further extension."

Shaw knew the requirements necessary to regain C.O. since September and December 2004. She did not begin to try to comply until April 2005, about eight months after his removal. Even after she began to make her efforts, she did not begin attending AA or NA meetings until July and did not take the parenting class until the month before trial. Shaw has not shown that needing

15

more time after failing to make progress for the first eight months of the court's order amounts to "extraordinary circumstances" that "necessitate[d]" the granting of a continuance. *See* Tex. Fam. Code Ann. § 263.401(b); *see also In re A.S.J.*, No. 04-06-00051-CV, 2006 Tex. App. LEXIS 5963, at *4-5 (Tex. App.—San Antonio July 12, 2006, no pet. h.) (parents "failed to provide any evidence of an extraordinary circumstance that would warrant an extension of time"; they "were aware they had one year to fulfill the requirements of their family service plans and failed to do so"). Therefore, Shaw has not shown that the trial court abused its discretion in refusing to grant the continuance. We overrule Shaw's tenth issue on appeal.

### Conclusion

Even without any reference to Shaw's juvenile records, the evidence is legally and factually sufficient to support the trial court's findings that Shaw failed to comply with the court's orders or placed the child in circumstances that endangered his well-being and that termination was in the child's best interest. Shaw has not shown that the trial court abused its discretion in denying her motion for a continuance. We therefore affirm the trial court's termination decree.

_____

David Puryear, Justice

Before Justices Puryear, Pemberton and Waldrop

Affirmed

Filed: August 31, 2006