

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
### FORT WORTH

## NO. 02-16-00458-CV

IN THE INTEREST OF P.S. AND
C.S., MINOR CHILDREN

----------

FROM THE 323RD DISTRICT COURT OF TARRANT COUNTY
TRIAL COURT NO. 323-100795-14

----------

## MEMORANDUM OPINION[1]

----------

### I. INTRODUCTION

In this accelerated appeal, Appellant Mother[2] challenges the trial court's

order, entered after a new trial to the bench, terminating her parental rights to her

minor children, Roy and Guy.  On appeal, Mother argues that the evidence was

legally and factually insufficient to support termination of her parental rights under

---

[1]*See* Tex. R. App. P. 47.4.

[2]To protect the anonymity of people associated with this appeal, we are using aliases for the minor children and their relatives.  *See* Tex. Fam. Code Ann. § 109.002(d) (West 2014); Tex. R. App. P. 9.8(b)(2).

Family Code §§ 161.001(b)(1)(D), (E), (K), and (O). *See* Tex. Fam. Code Ann. §§ 161.001(b)(1)(D), (E), (K), (O) (West Supp. 2016). Mother also argues that the evidence was legally and factually insufficient to support the trial court's findings that termination of her parental rights was in the children's best interests. *See* Tex. Fam. Code Ann. § 161.001(b)(2). We will affirm.

## II. BACKGROUND

### A. The Department's Involvement and Original Trial

The Department received a referral on September 9, 2014, alleging neglectful supervision of three-year-old Roy and one-month-old Guy by Mother because she had left them on their paternal grandmother's porch at 1:00 a.m. Allegedly, Mother and Father were arguing and physically fighting. The record contains allegations that Mother might have been suffering from postpartum depression, and there were concerns that she might harm the children. On September 16, 2014, the Department received another referral alleging neglectful supervision of Roy and Guy by Mother. A Department caseworker averred that Mother's drug use was affecting her ability to protect the two boys. The caseworker also said that Mother was exhibiting paranoid behavior that created an unsafe environment for the boys.

On September 29, 2014, the Department administered oral swab drug screenings to Mother and Father—both came back positive for amphetamine, methamphetamine, and opiates. Later, Roy tested positive for

2

methamphetamine and amphetamine and Guy tested positive for opiates, oxycodone, and hydrocodone.

The Department filed its suit affecting the parent-child relationship on September 30, 2014, the goal being reunification. To this end, the Department provided Mother with a family service plan, and the trial court ordered that reunification could only occur if Mother complied with the service plan's conditions. Mother's participation in the plan was spotty and inconsistent. Specifically, the record indicates that although Mother went in for individual counseling and completed the intake, she became upset with the counselor and left. Mother did complete her assessment at CATS and was referred to outpatient classes, and she went to two group substance-abuse counseling sessions and two parenting classes through CATS but was asked not to return because she had an outburst of anger at Father's session, requiring the police to be called. Throughout the Department's involvement, Mother did not submit to numerous random drug tests; at one point, she was dropped from parenting classes due to her lack of attendance; and she failed to demonstrate steady employment and attend regular visitation with the boys. Much of the time, Mother lived in a shelter.

On January 27, 2016, Mother and Father both entered a mediated agreement with the Department wherein both parents agreed to execute voluntary relinquishment affidavits. In consideration for the execution of the affidavits, the Department agreed that if Mother and Father failed to complete

3

their services by August 15, 2016, the Department would pursue termination on the basis of voluntary relinquishment grounds only. In the agreements, both parents agreed that should termination occur, termination of parental rights was in the children's best interests. The trial court incorporated the conditions of the agreement into an order on February 2, 2016.

On August 22, 2016, the Department pursued termination. Neither Mother nor Father attended trial. Although the original petition contained four separate grounds for termination, the Department informed the trial court that it was proceeding only on the ground of the parents' affidavits. At trial, and specifically regarding Mother, the Department presented evidence that Mother failed to complete her agreed-upon services. The Department presented evidence that Mother failed to timely report for drug testing as required by the agreement, that she did not provide documentation evidencing safe and stable housing as required by the agreement, that she did not provide documentation of employment as required by the agreement, and that she did not complete substance-abuse classes as required. After the State asked the court to terminate solely on the basis of both parents' affidavits, the trial court terminated both Father's and Mother's parental rights on that basis alone.

## B.    Evidence and Testimony at the New Trial

On September 8, 2016, Mother filed a motion for new trial alleging that the evidence was legally and factually insufficient to show: 1) that she voluntarily executed her affidavit and 2) that termination was in the children's best interests.

4

The Department agreed to a new trial. The Department proceeded on all four grounds of the original petition.

Stephanie Roesch, who served in her capacity as a conservatorship worker for the Department throughout this case, testified at the new trial. According to Roesch, the Department first became involved with Roy and Guy in 2013 when the Department investigated Mother and Father for domestic violence and drug abuse. Roesch averred that during the early part of her investigation, both Mother and Father could not be located and thus did not participate in the Department's services. Roesch said that the Department received new domestic violence allegations again in September 2014.

By Roesch's account, the second referral pertained to an event when Mother drove the two children to the paternal grandmother's house at 1:00 a.m. and dropped both of the children off on the porch. Roesch said that the children were wearing only their diapers. Roesch averred that about this time, the Department also received information that Mother began to act very paranoid, calling the police several times in a week and making dubious claims. Because of her behavior, Mother was taken to the hospital for examination. According to Roesch, initially Mother and Father asked that Roy and Guy be placed with their paternal grandmother, which they temporarily were, but eventually the Grandmother reported that because of Mother's behavior, she would no longer be able to provide a home for the children. From there, the Department took

5

temporary managing conservatorship of the two children—they were eventually placed in a foster home.

Roesch said that the reason the children could not live with Mother and Father was because of Mother's "erratic behaviors, paranoid behaviors, drug use, [and] domestic violence" and because of Father's "domestic violence and drug use." Roesch testified, and the Department introduced medical documentation to support her testimony that Guy had once tested positive for opiates, oxycodone, and hydrocodone and that Roy had tested positive for amphetamine and methamphetamine. Roesch averred that Father told her that Guy tested positive because he was breastfeeding and that Roy had been exposed to an environment containing methamphetamine.

Roesch also averred that both Mother and Father had a criminal history. The Department introduced criminal records indicating that Mother had previous convictions for theft and criminal mischief and that she had received deferred adjudication for harassment. The Department also introduced similar documents demonstrating that Father had been found guilty of two separate counts of assault causing bodily injury to a family member.

Roesch said that she met with both Mother and Father during her investigation, that she developed service plans for both parents, and that both had signed their plans. Roesch testified that part of Mother's plans included that she attend and complete counseling, parenting classes, and anger management and that she submit to drug assessment and random drug testing. Roesch

6

averred that Mother took a "psychological" and that she completed anger management and parenting classes.

Roesch said that Mother's psychological evaluation revealed that Mother experienced depressive disorder, unspecified anxiety disorder, and unspecified personality disorder and that she was prescribed medicines for these conditions. By Roesch's account, Mother initially took her medications but later stopped "giving medication forms."

Roesch testified that the Department was also concerned with Mother's ability to provide a stable living environment for the boys. Roesch said that Mother would either live from "hotel to hotel," at a shelter, or in her car and that her relationship with Father was "on again, off again." Roesch further stated that Mother had failed to provide evidence that she had stable employment in that she produced only two paycheck stubs during the Department's involvement. Regarding Mother's drug use and required testing, Roesch averred that Mother either refused or missed multiple drug tests.

Speaking to Mother's behavior, Roesch said that once when Roesch asked for Mother to submit to a urine test, Mother called Roesch a "child molesting bitch." And, by Roesch's account, on another occasion Mother was expelled from some of her services because she "caused a big scene" in attempts to get Father to speak to her. Roesch also said that one counselor was unable to get an assessment of Mother because she had become so irate.

7

Regarding Father, Roesch said that Father also failed to complete his services, failed numerous drug tests, failed to submit to other drug tests, and lived a transient life. Roesch also said that Father had informed her that Mother had used drugs throughout the time the Department was involved in this case and that he desired for the children to stay in foster care. According to Roesch, Father also told her that he did not believe Mother was financially or mentally able to take care of the children.

Roesch said that in January of 2016, through a mediated agreement, both Mother and Father signed a voluntary relinquishment wherein they agreed that if they failed to participate in certain service plans and remain drug free for six months, they would voluntarily relinquish their parental rights to Roy and Guy and that termination of their parental rights was in the children's best interests. The Department introduced a copy of this agreement at trial. Roesch said that after that time, neither Mother nor Father attended all of their ordered services.

Specifically regarding Mother, Roesch said that in addition to not completing all her ordered courses, Mother also failed to provide proof of employment, complete attendance at Narcotics Anonymous, and submit to drug tests. Roesch said that during the six-month period, Mother also tested positive for amphetamine and methamphetamine. The Department introduced a lab report consistent with Roesch's testimony. Roesch said that although Mother completed some counseling, she did not complete her counseling pertaining to

drug treatment and education. Roesch also averred that Mother did not complete her domestic violence education and counseling.

Roesch also said that during the six-month period, Father sent pictures of his head with what appeared to be "road rash" that Father said was caused by Mother hitting him with a vehicle. Allegedly, Father was at the hospital when he took and sent the pictures. Roesch averred that in her opinion, both Mother's and Father's parental rights to the two children should be terminated and that it was in both children's best interests.

Regarding Roy and Guy's current placement, Roesch said that the two children had been in a foster home for the past eighteen months and that both were "doing really good." Roesch said that since the two boys had been placed in foster care, she had seen "great improvements" in Roy and that he had progressed beyond concerns of being developmentally delayed to now being developmentally on target. Roesch said that prior to placement, Roy would not talk, that he was very "standoffish", and that he would wet the bed but that now he is frequently happy and smiling. Roesch said that Roy and Guy were also bonded with the foster parents and with the foster couple's biological son. Roesch said that the foster parents planned to adopt both children.

Joanna Letz, Roesch's supervisor at the Department, testified that she supervised this case. According to Letz, Mother and Father both entered into the voluntary relinquishment agreements with a full understanding that this was yet another chance to maintain a parent-child relationship with Roy and Guy. Letz

9

testified about a visitation between Mother and the children that occurred in August of 2016—a time between the first trial and the new trial. About forty-five minutes into that visit, according to Letz, Mother began to search the children by lifting up their hair and clothing and made accusations that the children were being abused.

By Letz's account, Mother would vacillate between being calm and being agitated, including yelling and arguing with Department staff. Letz said that this frightened the children so much that they went and hid under blankets. After workers convinced the children to return to the visit, Letz, who was supervising the visit, said that Mother whispered something to Roy and that he began to cry. Letz said that Roy then began to hold onto Guy very tightly, that both children began to cry loudly, and that Mother began to shout that the Department had no right to take her children from her. Letz said that security had to be called to prevent Mother from leaving with Roy and that the visitation had to be ended early.

Letz said that she had spoken with Father prior to trial and that Father desired for the trial to go forward and for his parental rights to be terminated. Letz averred that Father did not want to come to trial and testify because he feared Mother because she had come to his place of employment three weeks prior to the new trial and police had to escort her away. Letz said that Father's employer said that on the day of the new trial, he was going to lock the doors because he also feared Mother's retaliation.

Letz averred that it was in both children's best interests that Mother's and Father's parental rights be terminated. Specifically, Letz said that neither Mother nor Father were emotionally or financially capable of providing for either of the children. Letz said that she had witnessed Mother "become very unstable" on numerous occasions. Letz said that she had personally witnessed Mother go from "calm to erratic and yelling and storming out" in the children's presence. Letz also testified that Mother did not seem concerned for the children's well-being when she would become emotional.

Regarding the children's current placement, Letz said that the children were both "doing very well." Letz averred that Roy and Guy had made dramatic strides developmentally since being placed in foster care and that they were basically not the same children as when they arrived. Letz described the children in their current environment as "thriving, very interactive, [and in good] health."

Grandmother testified at the new trial. Grandmother said that Mother exhibited behavior that concerned her for herself and for the safety of the children. Specifically, Grandmother said that Mother had threatened that if she lost her children, she was going to kill Father, Grandmother, and then herself. Grandmother said that Mother's overall behavior was "erratic" and that on some days, Mother's behavior would be good but that then on other days, her behavior would be violent. She recalled the incident wherein Mother and Father had gotten into a fight and then in the early morning, Mother dropped the boys off on her porch. Grandmother said that she found Roy running up and down the street

11

wearing only a diaper. She said that she then had to go to the store to buy "formula, diapers, and . . . the necessary things to get them started until" she was able to call the Department.

Grandmother also averred that when with their parents, the children lived an unstable and transient life. She recalled an event wherein the family had once been locked out of a motel. But Grandmother said that since the children had lived in foster care, the children were very happy and thriving. Grandmother testified that she believed it would be dangerous to the boys for them to be returned to Mother.

Stephanie, the children's current foster mother, testified as well. Stephanie said that the children had lived with her family for roughly the past two years. According to Stephanie, when the children first arrived in her care, Roy had trouble adapting. Stephanie said that Roy exhibited attachment and bonding issues as well as extreme hyperactivity. She also said that when he first arrived, he was very delayed in numerous areas and that he would frequently wake during the night because of nightmares. Stephanie averred that Roy was currently in therapy for anger and sadness. She also said that Roy experienced a heightened state of agitation after visiting with Mother but that his behavior improved once the visits ceased.

Currently, Stephanie averred that Roy is overall doing "really good" developmentally and that his nightmares have "tapered off." Stephanie said that Guy is currently doing "great" and is developmentally on target, perhaps even "a

12

little ahead of target." Stephanie said that she would be able to provide for both of the children's medical needs should anything arise and that she was a stay-at-home mother with the two boys and her biological son. Stephanie averred that the three boys were very bonded and that they acted like "very typical brothers" toward one another. She said that it was her plan to adopt Roy and Guy if the court terminated the parental rights of Father and Mother.

Mother testified at the new trial as well. Mother said that she had completed parenting classes and anger management. She also averred that she was currently taking medication for anxiety and depression. Mother agreed that her relationship with Father was a violent one and that it contained a significant amount of fighting. Mother said that she now had a two-bedroom home that she had placed a down payment on the day of the new trial and that she was receiving financial help from a support group in order to do so, but she said that she was unable to produce documentation that satisfied her court-ordered services. Mother averred that she had been working two jobs but that Father called both employers and that "the next day [she] was fired." She also alleged that Grandmother had interfered with her ability to gain employment. Mother said that although she was not currently employed, she believed she had a good opportunity to be employed within months.

Mother confirmed the incident wherein she dropped the boys off on Grandmother's porch, but she said that the incident occurred under "different circumstances" than her current ones. She said that if her children were returned

13

to her, she would make sure that Roy was in a good school and that Guy received day care because she expected to work "40 plus hours a week." Mother said that she was not asking for the children's immediate return but rather asking for time to get moved in and established prior to reunification. She also admitted that she had not completed all of her services nor had she been able to show stable employment. Mother agreed that she had failed drug tests and that she had struggled with methamphetamine use, but she averred that her drug use was no longer going to be an issue. She also agreed that the police were called when she had recently gone to Father's place of employment, but she averred that she is the one who asked the police to be called because Father would not give her the keys to her vehicle.

Mother agreed that the children's lives were not stable when they were previously in her care and that currently "the foster parents have done a great job." Mother said that she entered the voluntary relinquishment agreement with full understanding of what she was doing.

After the new trial, the court found that Mother had knowingly allowed the two boys to remain in conditions or surroundings which endangered their physical or emotional well-being, that Mother had engaged in conduct or knowingly placed the boys with persons who engaged in conduct which endangered their physical or emotional well-being, that Mother and Father had executed unrevoked or irrevocable affidavits of relinquishment of parental rights to both boys, and that Mother had failed to comply with court-ordered services

14

necessary for the return of Roy and Guy. *See* Tex. Fam. Code Ann. §§ 161
.001(b)(1)(D), (E), (K), and (O). The trial court also found that termination of
Father's[3] and Mother's parental rights was in both Roy's and Guy's best
interests. Mother appealed the trial court's ruling.

### III. STANDARDS OF REVIEW IN PARENTAL-RIGHTS TERMINATION CASES

In evaluating the evidence for legal sufficiency in parental-rights
termination cases, we determine whether the evidence is such that a factfinder
could reasonably form a firm belief or conviction that the challenged ground for
termination was proven. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005).

In reviewing the evidence for factual sufficiency, we give due deference to
the factfinder's findings and do not supplant the judgment with our own. *In re
H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). We determine whether, on the entire
record, a factfinder could reasonably form a firm conviction or belief that the
parent violated the relevant conduct provision of section 161.001(b)(1) and that
the termination of the parent-child relationship would be in the best interest of the
child. Tex. Fam. Code Ann. § 161.001(b); *In re C.H.*, 89 S.W.3d 17, 28 (Tex.
2002). If, in light of the entire record, the disputed evidence that a reasonable
factfinder could not have credited in favor of the finding is so significant that a
factfinder could not reasonably have formed a firm belief or conviction in the truth

---

[3]Father has not appealed the trial court's ruling.

of its finding, then the evidence is factually insufficient. *H.R.M.*, 209 S.W.3d at 108.

## IV. Discussion

### A.    Mother's Failure to Comply with Court-Ordered Services

In her third issue, Mother argues that the evidence was legally and factually insufficient to support the trial court's finding that she failed to comply with the provisions of a court order that specifically established the actions necessary for her to obtain the boys' return to her. We disagree.

Subsection (O) authorizes termination if the trial court finds, by clear and convincing evidence, that a parent has

> failed to comply with the provisions of a court order that specifically established the actions necessary for the parent to obtain the return of the child who has been in the permanent or temporary managing conservatorship of the Department of Family and Protective Services for not less than nine months as a result of the child's removal from the parent under Chapter 262 for the abuse or neglect of the child.

Tex. Fam. Code Ann. § 161.001(b)(1)(O). Thus, under subsection (O), the Department must prove that (1) the Department has been the child's temporary or permanent managing conservator for at least nine months, (2) the Department took custody of the child as a result of a removal from the parent for abuse or neglect, (3) a court issued an order establishing the actions necessary for the parent to obtain the return of the child, and (4) the parent did not comply with the court order.

16

Here, Mother does not dispute the existence of evidence sufficient to support findings for elements 1, 2, and 3; rather, Mother argues "she has completed the services requested of her and those were sufficient to eliminate the risks that originally brought the children into the care of the Department." But a review of the record demonstrates that Mother failed to comply with most of her court-ordered services.

In her court-ordered services plan, among other requirements, Mother was required to provide documentation of a "fully executed lease evidencing safe and stable housing for a period of six consecutive months"; provide documentation of employment or income sufficient to support the boys for a period of six consecutive months; regularly attend Narcotics Anonymous at a rate of no less than three times per week; submit to and pass random drug tests; and successfully complete drug-abuse treatment.

Here, Mother's own testimony confirms that she failed to complete the requirements listed above. Mother testified that she had provided no documentation of a lease and that she had, the day of trial, finally placed a down payment on a house capable of housing the boys. Mother further averred that during the six-month period prior to the new trial on November 7, 2016, she had lived a very nomadic life, including living with Father and at a shelter. Mother candidly admitted that although she had maintained some employment during the relevant time-period, she was not currently employed at the time of the new trial, and that she had not maintained—and thus could not provide documented

17

support of—employment or income sufficient to support the boys for the required six-month period. In fact, Mother testified that even at the time of the new trial, she still did not have stable housing and employment and that she was asking the court to delay the boys' return to her so that she could continue to work toward that goal. Mother also testified that she ceased attending Narcotics Anonymous regularly in April 2016, which demonstrates that she failed to abide by the court-ordered services that she attend Narcotics Anonymous three times a week during the six-month period of time after she entered into the mediated agreement. And Mother also admitted that she failed a drug test because she had used methamphetamine during the time in which the court-ordered services declared that she was not to fail a drug test. She also averred that she had missed nine of her required classes in order to successfully complete drug-abuse treatment.

Mother's testimony was also corroborated by multiple Department witnesses, who testified to Mother's inability to provide stable housing and employment, to Mother's failure to submit to drug testing, to Mother's failure to attend Narcotics Anonymous, and to Mother's failure to complete drug-abuse treatment.

Because a reasonable factfinder could have formed a firm belief or conviction that Mother failed to comply with the terms of the order establishing the actions necessary for her to obtain the boys' return, we conclude that the

18

evidence is legally sufficient to support the trial court's finding. *J.P.B.*, 180 S.W.3d at 573.

Furthermore, Mother points to no contradictory evidence in the record to show that she complied with all the terms of the order establishing the actions necessary for her to obtain the boys' return. Therefore, after considering the entire record, we conclude that the evidence is factually sufficient to support the trial court's finding that Mother failed to comply with the order. *H.R.M.*, 209 S.W.3d at 108. We overrule Mother's third issue.

Because a finding as to any one of the acts or omissions enumerated in section 161.001(b)(1) is sufficient to support termination, we need not address Mother's first, second, and fourth issues challenging the trial court's findings under subsections (D), (E), and (K). *See* Tex. Fam. Code Ann. §§ 161.001(b)(1)(D), (E), (K). We must still, however, determine whether the evidence was sufficient to support the trial court's finding that termination was in Roy's and Guy's best interests, pursuant to section 161.001(b)(2).

**B.    Trial Court's Best-Interest Finding**

In her fifth issue, Mother argues that the evidence was legally and factually insufficient to support the trial court's finding that termination of her parental rights was in the children's best interests. We disagree.

There is a strong presumption that keeping a child with a parent is in the child's best interest. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). Prompt and permanent placement of the child in a safe environment is also presumed to be

19

in the child's best interest. Tex. Fam. Code Ann. § 263.307(a) (West Supp. 2016).

We review the entire record to determine the child's best interest. *E.C.R.*, 402 S.W.3d 239, 250 (Tex. 2013). The same evidence may be probative of both the subsection (b)(1) ground and best interest. *C.H.*, 89 S.W.3d at 28; *see E.C.R.*, 402 S.W.3d at 249. Nonexclusive factors that the trier of fact in a termination case may also use in determining the best interest of the child include:

(A)    the desires of the child;

(B)    the emotional and physical needs of the child now and in the future;

(C)    the emotional and physical danger to the child now and in the future;

(D)    the parental abilities of the individuals seeking custody;

(E)    the programs available to assist these individuals to promote the best interest of the child;

(F)    the plans for the child by these individuals or by the agency seeking custody;

(G)    the stability of the home or proposed placement;

(H)    the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and

(I)    any excuse for the acts or omissions of the parent.

*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976) (citations omitted); *see E.C.R.*, 402 S.W.3d at 249 (stating that in reviewing a best-interest finding, "we

20

consider, among other evidence, the *Holley* factors"); *In re E.N.C.*, 384 S.W.3d 796, 807 (Tex. 2012).

These factors are not exhaustive—some listed factors may be inapplicable to some cases. *C.H.*, 89 S.W.3d at 27. Furthermore, undisputed evidence of just one factor may be sufficient in a particular case to support a finding that termination is in the best interest of the child. *Id.* On the other hand, the presence of scant evidence relevant to each factor will not support such a finding. *Id.*

With regard to the children's desires, the record indicates that at the time of the new trial, Roy was five years old and Guy was two, thus they did not testify at trial. But the record does contain evidence that during visitations, Roy and Guy feared Mother at times and that after visitations, Roy would act out and behave in an agitated manner. Furthermore, both Department workers and Stephanie, the foster mother, testified that the boys were bonded to their foster parents and brother. *See Smith v. Tex. Dep't of Protective & Regulatory Servs.*, 160 S.W.3d 673, 682 (Tex. App.—Austin 2005, no pet.) (stating that best-interest focus is on the children, not the needs and desires of the parent). The trial court was entitled to find that this factor weighed in favor of termination of Mother's parental rights to the children.

With regard to the emotional and physical needs of the children now and in the future, the children's basic needs included food, shelter, and clothing; routine medical and dental care; a safe, stimulating, and nurturing home environment;

and friendships and recreational activities appropriate to their ages. *In re L.S.*, No. 02-16-00197-CV, 2016 WL 4699199, at *6 (Tex. App.—Fort Worth Sept. 8, 2016, no pet.) (mem. op.). Although Mother testified that she would be able to provide safe and stable housing for the children in the future, she admitted that she had not demonstrated the ability to provide a stable environment for the children due to her numerous moves and inability to maintain employment. In contrast, in their current placement in a foster home, the boys have progressed from being underdeveloped to being on target. Specifically regarding Roy, evidence at trial revealed that prior to placement in foster care, Roy would not talk; he was very "standoffish"; he would wet the bed; and he experienced frequent nightmares. Now he is described as frequently happy and smiling, and his nightmares have tapered off. Moreover, Stephanie testified that she would provide medical care for both of the boys in the future should the need arise. The trial court was entitled to find that this factor weighed in favor of termination of Mother's parental rights to the children.

With regard to the emotional and physical danger to the children now and in the future, the evidence demonstrated that Mother struggles with drug abuse and that both boys have tested positive for drugs. Evidence at trial suggests that Mother has left the boys unattended in the middle of the night on Grandmother's porch and that Roy was found running up and down the street only in his diaper. Furthermore, numerous witnesses testified that Mother struggles with emotional and violent outbursts and has been diagnosed with depression and personality

22

disorder. One Department witness testified that Mother did not seem concerned with the boys' well-being when she would become emotionally irate. And in one instance, during the six-month period wherein Mother was being evaluated under what was described to her as yet another chance for reunification, Mother caused her boys to cry and hide from her during a supervised visitation—a visitation wherein security was called when Mother tried to leave with Roy and the visitation had to be ended early. The trial court was entitled to find that this factor weighed in favor of termination of Mother's parental rights to the children.

With regard to Mother's parental abilities, the record reveals that the Department became involved because Mother had left the children unattended, Roy had tested positive for amphetamine and methamphetamine; Guy had tested positive for opiates, oxycodone, and hydrocodone; and the children lived a transient life filled by domestic violence. The record further reveals that during supervised visits, Mother would act bizarre toward the children—lifting up their clothes, sifting through their hair, and making accusations that the Department was abusing them. During one visit, she caused both boys to cry and hide from her, security was called to prevent her from leaving with Roy, and the visitation had to be ended early. Mother has also failed to demonstrate that she is capable of not using methamphetamine. Mother offered no evidence as to how or why her behavior would change in the future. The trial court was entitled to find that this factor weighed in favor of termination of Mother's parental rights to the children.

23

Mother also failed to avail herself of all services made available to her by the Department. Significantly, Mother failed to fully avail herself of drug-abuse counselling and Narcotics Anonymous. The trial court was entitled to find that this factor weighed in favor of termination of Mother's parental rights to the children.

With regard to the plans for the children by the individual seeking custody and the stability of the home or proposed placement, Mother's plans for the children included for them to grow up happy and educated, but she had not established a stable home for them to live in at the time of the termination trial nor had she demonstrated an ability to financially provide for them. In contrast, the foster mother testified that since being in foster care, the boys have grown from developmentally delayed to now being developmentally on target. The foster mother testified that she would provide the boys' medical needs and that she was a stay-at-home mother who intended to watch the children and provide for their needs. And the foster parents intend to adopt both boys, who by all accounts have bonded with the foster family. The trial court was entitled to find that this factor weighed in favor of termination of Mother's parental rights to the children.

With regard to the acts or omissions of Mother that may indicate the existing parent-child relationship is not a proper one, the evidence set forth above—which details Mother's drug use and that both boys have tested positive for drugs, Mother's under-addressed mental health issues, her failure to establish

24

a home where her children could live, and her decision to leave her children unattended in the middle of the night—reveals that the existing parent-child relationship between Mother and the children is not a proper parent-child relationship. The trial court was entitled to find that this factor weighed in favor of termination of Mother's parental rights to the children.

As for any excuse for the acts or omissions of the parent, Mother blamed her inability to provide stable living and income on Father and Grandmother, and she offered no excuse for having failed to complete the other portions of her court-ordered services. The trial court was entitled to find that this factor weighed in favor of termination of Mother's parental rights to the children.

Viewing all the evidence in the light most favorable to the best-interest finding and considering the nonexclusive *Holley* factors, we hold that the trial court could have reasonably formed a firm conviction or belief that termination of the parent-child relationship between Mother and the children was in the children's best interests, and we therefore hold the evidence legally sufficient to support the trial court's best-interest finding. *See* Tex. Fam. Code Ann. § 161.001(b)(2); *Jordan v. Dossey*, 325 S.W.3d 700, 732–33 (Tex. App.—Houston [1st Dist.] 2010, pet. denied) (holding evidence legally sufficient to support the trial court's finding that termination of mother's parental rights was in child's best interest when most of the best-interest factors weighed in favor of termination); *see also In re T.R.M.*, No. 14-14-00773-CV, 2015 WL 1062171, at *11–12 (Tex. App.—Houston [14th Dist.] Mar. 10, 2015, no pet.) (mem. op.)

25

(holding evidence legally sufficient to support trial court's best-interest finding based on mother's lack of a safe, stable home environment; lack of stable employment; noncompliance with services; and drug use).

Similarly, reviewing all the evidence with appropriate deference to the factfinder, we hold that the trial court could have reasonably formed a firm conviction or belief that termination of the parent-child relationship between Mother and the children was in the children's best interests, and we therefore hold that the evidence is factually sufficient to support the trial court's best-interest findings. *See* Tex. Fam. Code Ann. § 161.001(b)(2); *Jordan*, 325 S.W.3d at 732–33; *see also In re S.B.*, 207 S.W.3d 877, 887–88 (Tex. App.—Fort Worth 2006, no pet.) ("A parent's drug use, inability to provide a stable home, and failure to comply with [a] family service plan support a finding that termination is in the best interest of the child."). We overrule Mother's fifth issue.

## V. CONCLUSION

Having overruled Mother's third and fifth issues, and not needing to address her first, second, and fourth issues, we affirm the trial court's judgment.

/s/ Bill Meier
BILL MEIER
JUSTICE

PANEL: LIVINGSTON, C.J.; WALKER and MEIER, JJ.

DELIVERED: March 30, 2017

26