# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-19-00217-CV

---

**N. P. and J. P., Appellants**

**v.**

**Texas Department of Family and Protective Services, Appellee**

---

### FROM THE 207TH DISTRICT COURT OF COMAL COUNTY
### NO. C2017-2053B
### THE HONORABLE CHARLES A. STEPHENS II, JUDGE PRESIDING

---

## M E M O R A N D U M   O P I N I O N

Following a bench trial, J.P. (the Mother) and N.P. (the Father)[1] appeal from the trial court's final order terminating their parental rights to their child A.P., born in February 2010, and terminating the Mother's parental rights to her child K.J., born in May 2006.[2] *See* Tex. Fam. Code § 161.001 (providing for involuntary termination of parent-child relationship). Because the Father did not file an appellant brief, we dismiss his appeal for want of prosecution.[3] As to the Mother's appeal, she raises a single issue challenging the legal and

---

[1] We refer to the parties by initials to protect their privacy. *See* Tex. Fam. Code § 109.002(d); Tex. R. App. P. 9.8.

[2] K.J.'s father D.J. also had his parental rights terminated but did not appeal.

[3] The Father filed a notice of appeal on March 29, 2019. On April 4, the Father's court appointed trial attorney submitted notice to this Court of the trial court's March 29 order finding that the Father is not indigent and permitting the Father's counsel to withdraw from

factual sufficiency of the trial court's finding that termination is in the best interest of the children, *see id.* § 161.001(b)(2) (requiring finding by "clear and convincing evidence" that "termination is in the best interest of the child"), but she does not dispute the finding that she committed statutory grounds for termination, *see id.* § 161.001(b)(1)(D), (E), (O), (P). For the following reasons, we overrule the Mother's sole issue on appeal and affirm the trial court's order.

## BACKGROUND

In this case, a bench trial began on November 30, 2018, and continued on January 24 and February 21, 2019. In addition to the Father and the Mother, the following witnesses testified at trial: Kathleen O'Reilly, A.P.'s school counselor; Ashley Bastian, the Department's investigator; Jennifer Hall, the Department's caseworker; Leslie Scibienski, A.P. and K.J.'s appointed guardian ad litem; the Father's half-brother's stepfather; and the Father's

---

representation "upon the timely and proper filing of a Notice of Appeal." The Father's brief was due to be filed on May 29. On June 11, this Court ordered the Father to file his brief no later than June 21, warning that his appeal "may be dismissed for want of prosecution." *See N.P. v. Texas Dep't of Family & Protective Servs.*, No. 03-19-00217-CV, 2019 WL 2440109, at *1 (Tex. App.—Austin June 11, 2019, order). To date, the Father has not filed a brief. Accordingly, we dismiss his appeal for want of prosecution. *See* Tex. R. App. P. 42.3(b), (c) (providing for involuntary dismissal for want of prosecution or failure to comply with rules of appellate procedure, court order, or notice from clerk requiring action within specified time); Tex. Fam. Code § 263.405(a)–(b) (providing that "appeal of a final order rendered under this subchapter is governed by the procedures for accelerated appeals in civil cases under the Texas Rules of Appellate Procedure" and requiring order to contain notice that failure to follow Texas Rules of Appellate Procedure for accelerated appeals may result in dismissal of appeal); *S.P. v. Texas Dept. of Family & Protective Servs.*, No. 03-13-00504-CV, 2013 WL 6178566, at *1 (Tex. App.—Austin Nov. 22, 2013, no pet.) (mem. op.) (dismissing appeal from order terminating parental rights for want of prosecution when appellant failed to file brief following notice of deadline and "has not asserted a claim of indigence on appeal"); *cf. In re B.L.D.*, 113 S.W.3d 340, 350–51 (Tex. 2003) (holding fundamental error doctrine from "quasi-criminal" cases providing that court may review error that was neither raised in trial court nor assigned on appeal does not apply to parental rights termination cases).

sister (the Aunt). The following recitation of facts is taken from the testimony and exhibits presented at trial.

On November 9, 2017, the Department received a referral from O'Reilly after A.P. came to school with a black eye and made an outcry of abuse. O'Reilly testified that A.P. told her that her parents started fighting; that her Father then "pulled her out of the car, and she hit the side of her face on the door"; and "that she got choked from the seat belt, which left a mark on her neck." O'Reilly explained that she made the referral because, in addition to the black eye and outcry of abuse, A.P. told her that her Mother "drives drunk a lot, and that's why her dad would fight with her, because he didn't want her in the car with her mother" and that "her parents physically fight often." O'Reilly also had concerns regarding A.P.'s school attendance and the Father's slurred speech when he would pick up A.P. from school.

The day after receiving the referral, the Department sent its investigator Bastian to speak with A.P. and school personnel. A.P. told Bastian that she had "witnessed her parents choking each other, slapping each other, pushing each other on the ground, spitting on each other" and "that her parents drink an extensive amount of alcohol and would drive with [A.P. and K.J.] in the vehicles under the influence." Bastian next made contact with the Father at the RV park where he lived—although the Father was "in the midst of moving the RV to a new location"—and administered a mail-off drug test, which later came back positive for cocaine, methamphetamine, and hydrocodone. Bastian also attempted to contact the Mother but initially struggled making contact because the Mother was arrested for theft by check in November. On December 4, Bastian was able to make face-to-face contact with the Mother. The Mother admitted that there was domestic violence in her relationship with the Father and that the Father had even "attempt[ed] to kill [the Mother] by choking her," but explained that "she was not the

3

abuser, that it was [the Father]." The Mother denied any drug use; but when Bastian administered an instant drug test, she tested positive for methamphetamine. The Department exigently removed the children that day and placed them in a private foster home. The next day, the Department filed its original petition for protection of the children, for conservatorship, and for termination in the suit affecting the parent-child relationship, and Bastian filed an "Affidavit in Support of Exigent Removal."

In January 2018, Hall took over as caseworker, and in February 2018, Scibienski was appointed as the guardian ad litem for the children. Hall developed the Mother's service plan, which included requirements for psychological evaluation and drug testing and assessment. The Mother never completed the psychological evaluation and in her drug and alcohol assessment she was diagnosed with "amphetamine use disorder moderate and alcohol use moderate." The Mother did not complete the intensive outpatient or any substance abuse program as recommended. The Mother often missed her random drug tests, but in the tests she did complete, she tested positive for cocaine, marijuana, methamphetamine, benzodiazepine, hydrocodone, and hydromorphone. Her service plan also required her to refrain from criminal activity, but her probation was revoked twice in the course of this case and ultimately the Mother was sentenced to "a nine-month program at [a Substance Abuse Felony Punishment Facility (SAFP)] to be followed by 60 to 90 days in a halfway house, and then she would be on high-risk probation," which if "she failed to abide . . . she would be sent to prison for ten years." The Mother entered the SAFP facility on September 18, and at the time of trial, Guadalupe County was seeking to revoke her probation for failing to participate in the SAFP program. The Mother also was provided visitation with her children every other week until she was incarcerated in

4

May 2018, but she would frequently fail to show up or arrive late—she completely missed four, was late for two, and showed up on time for only two visits.

In June 2018, the children moved from their foster care home to Louisiana to live with the Aunt. The Aunt is an elementary school principal with two girls of her own, who were four and seven in 2018. The Aunt described the change as "[w]onderful" and said that her family has gone "from a family of four to a family of six overnight." When this change occurred, the Aunt sold her home and now they "are living in a home with a fourth bedroom to accommodate the girls." A.P. and K.J. are involved in their school programs, extracurricular activities, and city sport leagues. The Aunt testified that she and the Mother "have never been close"—she does "not agree with the decisions that [the Mother has] made over many years of knowing her" and "often questioned her choices as a mother," including that she "frequently visited the champagne fountain the night of [the Aunt's] wedding while she was visibly pregnant with [A.P.]." Nor is the Aunt close with the Father, "mainly because [she does] not agree nor support any of his lifestyle choices," including his "substance abuse"—a "severe drug problem"—and driving while intoxicated.

At the close of trial, the judge stated that "this Court is not going to wait for y'all [the Mother and Father] to get your act together. You've had that opportunity. You had that opportunity before the children were taken -- or removed, excuse me. And you have had the opportunity since to make the decision to put your children first, and for whatever reasons you have chosen not to do that or elected not to do that or failed to do that." On March 14, 2019, the judge signed a final order finding by clear and convincing evidence that it was in the children's best interest that the Mother's parental rights be terminated and that statutory grounds supported the termination. The Mother timely appealed the order.

5

## STANDARD OF REVIEW AND APPLICABLE LAW

"Texas Family Code section 161.001(b) allows for involuntary termination of parental rights if clear and convincing evidence supports that a parent engaged in one or more of the twenty-one enumerated grounds for termination and that termination is in the best interest of the child." *In re N.G.*, No. 18-0508, ___ S.W.3d ___, 2019 WL 2147263, at *1 (Tex. May 17, 2019) (per curiam). "Proceedings to terminate the parent-child relationship implicate rights of constitutional magnitude that qualify for heightened judicial protection." *In re A.C.*, 560 S.W.3d 624, 626 (Tex. 2018). "Because termination of parental rights 'is complete, final, irrevocable and divests for all time' the natural and legal rights between parent and child, a court cannot involuntarily sever that relationship absent evidence sufficient to 'produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established.'" *Id.* at 630 (quoting *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985); Tex. Fam. Code § 101.007). "This heightened proof standard carries the weight and gravity due process requires to protect the fundamental rights at stake." *Id.* And "[t]he distinction between legal and factual sufficiency lies in the extent to which disputed evidence contrary to a finding may be considered." *Id.*[4]

---

[4] The Texas Supreme Court explained this distinction as follows:

> In conducting a legal-sufficiency review, the reviewing court cannot ignore undisputed evidence contrary to the finding, but must otherwise assume the factfinder resolved disputed facts in favor of the finding. Evidence is legally sufficient if, viewing all the evidence in the light most favorable to the fact-finding and considering undisputed contrary evidence, a reasonable factfinder could form a firm belief or conviction that the finding was true.

> Factual sufficiency, in comparison, requires weighing disputed evidence contrary to the finding against all the evidence favoring the finding. In a

6

**DISCUSSION**

Because the Mother does not challenge the finding that statutory grounds support termination, we turn to the "second termination prong—best interests—[which] is child-centered and focuses on the child's well-being, safety, and development." *Id.* A best-interest determination is guided by several non-exclusive *Holley* factors, including:

> (1) the child's emotional and physical needs; (2) the emotional and physical danger to the child now and in the future; (3) the parental abilities of the individuals seeking custody; (4) the plans for the child by those individuals and the stability of the home; (5) the plans for the child by the agency seeking custody and the stability of the proposed placement; (6) the parent's acts or omissions that may indicate the existing parent-child relationship is improper; and (7) any excuse for the parent's acts or omissions.

*Id.* (citing *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976)); *see* Tex. Fam. Code § 263.307(b) (listing additional best-interest factors that are probative in "determining whether the child's parents are willing and able to provide the child with a safe environment"). "The absence of evidence about some of these considerations would not preclude a factfinder from reasonably forming a strong conviction or belief that termination is in the child's best interest," *In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002), but the best-interest finding "must be supported by

---

> factual-sufficiency review, the appellate court must consider whether disputed evidence is such that a reasonable factfinder could not have resolved it in favor of the finding. Evidence is factually insufficient if, in light of the entire record, the disputed evidence a reasonable factfinder could not have credited in favor of a finding is so significant that the factfinder could not have formed a firm belief or conviction that the finding was true.

*In re A.C.*, 560 S.W.3d 624, 630–31 (Tex. 2018) (footnotes and citations omitted).

7

clear and convincing evidence in the record," *In re E.N.C.*, 384 S.W.3d 796, 803 (Tex. 2012) (citing Tex. Fam. Code § 161.001(2)).

"[T]here is a strong presumption that the best interest of a child is served by keeping the child with a parent," *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006) (citing Tex. Fam. Code § 153.131(b)), and the Department carries the burden of proof to overcome that presumption with "clear and convincing evidence," *In re G.M.*, 596 S.W.2d 846, 847 (Tex. 1980); *In re U.P.*, 105 S.W.3d 222, 230 (Tex. App.—Houston [14th Dist.] 2003, pet. denied). This "heightened" burden of proof at trial results in a "correspondingly searching standard of appellate review." *A.C.*, 560 S.W.3d at 630. "As a matter of logic, a finding that must be based on clear and convincing evidence cannot be viewed on appeal the same as one that may be sustained on a mere preponderance." *C.H.*, 89 S.W.3d at 25. With these considerations in mind, we turn to the evidence presented in this case.

**A.P. and K.J.'s emotional and physical needs and emotional and physical danger now and in the future**

Generally speaking, the Aunt testified that the children do not want to live with either parent and that "[i]t's my understanding that they are happy where they are because of their stable, loving, healthy environment, and they do not like the environment that they came from that was full of violence and yelling and instability." She testified that in the past she has heard the Father and Mother "scream and holler at one another" in a "[l]oud," "[p]rofane," and "[f]rightening" manner in front of the children and that the Mother admitted she was in a domestic violence relationship with the Father.

A concern regarding emotional needs raised at trial is that K.J. was becoming "what they called parentified" and that it was "causing problems between these two sisters." The

Aunt explained this as "[K.J.] was [A.P.]'s mother" and "they've learned to survive the best way that they can." She said "that we have to often remind her that it's not her job to take care of [A.P.] anymore, that that is our responsibility, that it's okay to be her sister" and "just let her be her sister," which is "something new to [K.J.]." Scibienski testified that "[K.J.] took care of [A.P.] like a parent" and "was a little more reserved because she had to protect [A.P.]," but that she now loves when she can go "shopping" or "to a movie" because "[s]he just got to be a little girl." In short, she testified that "the parentified role no longer exists between the two girls" and that "[t]hey have their own identities" now that they are living with the Aunt and her family.

The Aunt and her family have provided A.P. and K.J. with school and extracurricular opportunities and A.P. and K.J. have excelled in school. Because A.P. "has lower reading comprehension levels," they "are going to have A.P. [in] a [section] 504 plan" so that "when it comes for standardized testing, she will have the accommodations to help with her reading comprehensions." Hall testified that A.P. is now "excelling" because "the [Aunt and her family] have taken care of [the reading comprehension problem] with a 504 plan" and "she gets extra help with her reading, and she gets extra tutorials with her math." Scibienski testified that she likes that the Aunt is "getting [A.P.] all the help" and "allow[ing] [K.J.] to be herself and enjoy her own interest." Scibienski testified that K.J. and A.P. are doing well and thriving "not because of the parents, but in spite of their parents." In fact, she said, "[t]hey are flourishing" and it would be in their best interest for them to stay there.

As to emotional and physical danger now and in the future, the Mother admitted that there was domestic violence in her relationship with the Father, that she "put [her]self in situations that [she] probably shouldn't have for that man," and "that has a lot to do with why [she] may be here today." The Mother also testified that "if [A.P.], in fact, said that she had a

9

black eye and she got the black eye because [the Mother] and [Father] were fighting over her and that's how she got the black eye" and that "if the child said that she was choked by a seat belt when [the Mother and Father] were fighting," she would not be lying. She testified that her children were exposed to domestic violence between her and the Father, and she even admitted to Bastian that the Father had tried to kill her. Yet, she nevertheless testified that she "just recently started talking to him again" and that she is not sure that their marriage "is ever going to work or if it is fixable," but that "anything is possible" and she is "just leaving the door open for continuation of this relationship." In contrast, Hall testified that the current placement with the Aunt is "probably one of the first times in [the children's] lives they are living in a home that is drug and violen[ce] free."

**The Mother's parental abilities, plans for the children, and stability of her home**

O'Reilly raised concerns regarding the Mother's parental abilities in the educational context, although she did not dispute that A.P. "appeared to be happy, fed, and properly clothed most of the time at school." She testified that parent-teacher conferences were set up regarding A.P. but that the Mother did not come to them. She also testified as to concerns regarding A.P.'s school attendance: from September 5 through November 9, 2017, A.P. had seven absences, seventeen tardies, and nine very late tardies, and she left school early four times. Scibienski also testified that A.P. "was really behind in her reading skills" and that both A.P. and K.J. "had very bad attendance when they were here." The Father's half-brother's stepfather testified that he had concerns regarding the Mother's parental abilities because "when they were over, the kids were parked in the bedroom, and they were never really checked on."

10

Hall also raised concerns regarding the Mother's parental abilities and described the Mother's visitations with her children as "very concerning and inappropriate." She described two examples. First, the Mother became frustrated when Hall told A.P. that her father was in jail and that is why he could not visit. The Mother then told A.P. that "he's not in jail. He is in the hospital. He has cancer like your papa who died from it, but don't worry, your dad's not going to die." Second, Hall described how she had to tell the Mother that it was inappropriate to be "talking about a friend of hers who had died" because "[i]t was the same friend that [A.P.] had made allegations of sexual abuse against," and that even though the Mother "never believed her daughter's outcry of sexual molestation by this man," the Mother "did not need to be discussing this man with her daughter."

Scibienski testified that the Mother "has a beautiful heart" and "loves her kids," but that during this case "neither of these two girls [A.P. and K.J.] have asked about their mother," which she found quite "odd." In viewing the Mother's interactions with her daughters, she did not see a connection between them. She also has concerns about the Mother's parenting abilities, including "her drug use," "[h]er instability," and "[t]he fact that she was living in a trailer, getting up in the middle of the night and moving to avoid authorities and dragging those two beautiful girls with her."

As to substance abuse, evidence at trial indicated that the Mother drank "an extensive amount of alcohol and would drive with [the children] in the vehicles under the influence," and tested positive for illegal drugs.[5] On December 4, 2017, the Mother tested

---

[5] "Proof of acts or omissions providing grounds for termination under section 161.001(b)(1) does not relieve the petitioner from proving the best-interest element, but the same evidence may be probative of both." *Id.* at 631–32 (citing *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002)).

positive for methamphetamine. Bastian testified that she then drove the Mother to the office to administer a mail-off drug test, and on the way, they stopped at a "gas station, where [the Mother] purchased a tall Smirnoff alcoholic beverage, which she hid in her purse, that I did not see until we got to the CPS office." The Mother tested positive for cocaine, marijuana, and methamphetamine on February 9, 2018, and methamphetamine, benzodiazepine, hydrocodone, and hydromorphone on March 5, 2018. The Mother did not complete requested drug tests on March 1 and 27 and April 4, 12, and 26. After April 26, Hall testified that she was unable to send the Mother more drug screens because she "could not get ahold of her, and then she was in jail as of May 31st." The Mother acknowledged that she has "made some bad decisions in the past" and admitted to using illegal drugs, but she feels that she has learned to make better decisions in the future and wants "an opportunity to get out and be the best that [she could] be for [her] two little girls and for [her] family who need [her]."

Hall also testified that the Mother failed to comply substantially with the terms of the Department's service plan: she did not complete her psychological evaluation; she failed to show up for multiple drug and alcohol assessments; she failed to show up for the scheduled intensive outpatient programs she was recommended to do; she did not complete any substance abuse program; she did not complete a domestic violence intervention program; her probation was revoked twice in the course of the case and she ended up in jail; she did not maintain a home that was safe, drug free, and violence free; she has not offered any proof of employment; and she frequently did not complete random drug testing and tested positive for drugs when she did complete the testing. As previously mentioned, the Mother also missed or showed up late to a majority of her visitations with her children. In short, Hall testified that the Mother has not demonstrated to the Department that she is able to have her children returned because she has not

12

provided any certificates of completion for any programs and she has not done the checklist of goals identified in the service plan.

There is some evidence that the Mother missed appointments due to vehicular troubles and that she was unable to complete her service plan due to her incarceration in the SAFP facility. She testified that she enrolled in classes while in the SAFP facility that would meet her service plan requirements, including classes on parenting, anger management, thinking for a change, life skills, and HIV and sex. She also listened when counselors would come in and speak on domestic violence relationships. However, she admitted that she did not complete the SAFP program or her service plan because she "was a mess"; her "kids just got ripped" from her; she was getting a divorce; she "started drinking" during this case because she "fell in a really dark place in [her] life"; and she "chose to hide from everybody because [she] was embarrassed."

As to the Mother's plans for the children, the record does not indicate that the Mother has any plans. Hall testified that she was unable to visit the Mother's home to check whether it was suitable for the children during the pendency of this case because she "got informed that [the Mother] had been evicted from that residence, and then the RV had burned and she couldn't stay there, and she was bouncing all over. So she never had a stable home that I could actually go and physically see." The Mother admitted that she does not have a job or a safe and stable home for the children. The Mother testified that she is "capable" to receive her children, "but just not at this time." She testified that she "know[s] that without a doubt, [she]'ll have [her] kids one day," but did not explain her plans for how she will have them, just that she's "trying to figure it out." Although she was currently in jail, she testified that "[i]f it were possible that [she] would be released from jail next week," she would "choose to go to a halfway home or an outpatient facility" and that she "would live either with [her] mother" or in her RV

13

parked near her probation officer "so that [she] can make sure that [she is] on time to [her] PO visits." But her plan does not account for her children and, according to Hall, Guadalupe County at the time of the trial was seeking to revoke the Mother's probation, and the Mother would be "facing ten years," which would be of "some concern with respect to any longevity or permanency between her and the girls."

**The Department's plans for the children and the stability of the proposed placement**

Hall testified that the Department's permanency plan for the children is "adoption by the [the Aunt]." The Aunt testified that she and her husband "would love to adopt both girls," and Scibienski confirmed that she believes the Aunt wants to adopt the children "very much so." The Aunt explained that A.P. "has expressed that she wants to live with us forever," K.J. "has expressed that she wants to stay where she is," neither child requests to speak with their mother, and the Aunt "do[es]n't think that they want a relationship with their mother." The Aunt testified that both girls "are happy, stable, healthy and well-adjusted"; they have bonded with her two children, and the four girls have a relationship "of normal sisters"; and "they are happy where they are because of their stable, loving, healthy environment, and they do not like the environment that they came from that was full of violence and yelling and instability." Given her concerns regarding the Mother, the Aunt testified that she would not consider supervised contact for the children with the Mother if the children were to stay with the Aunt and her family permanently after the trial. Scibienski also testified that the children have "stated they are home" in Louisiana with the Aunt and that "[t]his is where they want to be." She also testified that the Aunt is a school principal and "[t]hat's about as stable as you get, I feel, for a home environment for children."

14

There was no evidence to the contrary. The Mother considered herself "blessed" and "thankful" that the children are currently with the Aunt and said that she knows "without a doubt that they are okay and they are safe." The Father testified that "they are in a good environment" and that he "know[s] that [his] sister is taking good care of them."

**Conclusions regarding sufficiency**

In sum, the Department presented evidence that:

- The Mother used methamphetamine and other illegal drugs both before and after the children were removed. *See A. C. v. Texas Dep't of Family & Protective Servs.*, No. 03-18-00818-CV, ___ S.W.3d ___, 2019 WL 2384152, at *9 (Tex. App.—Austin June 6, 2019, no pet. h.) (noting that "drug-related conduct" may be given "great weight" by fact finder and that even if parent "might have stopped using methamphetamine later in the case," factfinder "could have reasonably inferred that the [parent's] past conduct could recur in the future if the child were to be returned"); *In re F.A.R.*, No. 11-04-00014-CV, 2005 WL 181719, at *4 (Tex. App.—Eastland Jan. 13, 2005, no pet.) (mem. op.) (noting that continued drug use demonstrates "an inability to provide for [the child's] emotional and physical needs" and to provide "a stable environment for" the child).

- She was involved in a violent relationship with the Father where A.P. was injured during one episode and the Father had threatened to kill the Mother in another episode, but the Mother still contemplated the possibility of continuing her relationship with the Father. *See In re A.M.*, 385 S.W.3d 74, 82 (Tex. App.—Waco 2012, pet. denied) (holding that "[e]vidence of past misconduct or neglect can be used to measure a parent's future conduct" including "a history of neglecting and endangering the children, of exposing them to domestic violence (between Appellant and the children's father), and of unstable housing, employment, and relationships"); *Smith v. Texas Dept. of Protective & Regulatory Servs.*, 160 S.W.3d 673, 681 (Tex. App.—Austin 2005, no pet.) ("[I]n determining whether a child has been endangered by a parent's conduct, it is not necessary that the conduct be directed at the child or that the child actually suffer injury."); *Williams v. Williams*, 150 S.W.3d 436, 451 (Tex. App.—Austin 2004, pet. denied) (noting that "a fact finder may infer that past conduct endangering the well being of a child may recur in the future if the child is returned to the parent").

- She did not complete her service plan; only took classes comparable to some of the classes required by the service plan when she entered the SAFP facility, but did not complete the SAFP program; failed to visit her children regularly and timely while the case was pending; and acted improperly in some of the visitations for which she did show up. *See A.C.*, 2019 WL 2384152, at *10 (noting that factfinder could have reasonably

15

inferred that parent "was not ready, willing, or able to be a parent to the child" from "failure to visit the child on a consistent, regular basis" and "failure to complete [] parenting classes"); *In re S.N.*, 287 S.W.3d 183, 193 (Tex. App.—Houston [14th Dist.] 2009, no pet.) (concluding that parent's inconsistent and missed visits and failure to complete parenting classes supported trial court's best interest determination).

- She undisputedly does not have a job or a safe and stable home for the children. *See A.M.*, 385 S.W.3d at 82–83 (noting that "[t]he need for permanence is a paramount consideration for a child's present and future physical and emotional needs" and considering the history of "unstable housing, employment, and relationships").

  - She faced an uncertain future and potentially "would be sent to prison for ten years." *See id.* at 82 (considering in best interest analysis that "Appellant was subject to having her community supervision revoked and being incarcerated"); *Smith*, 160 S.W.3d at 682 ("Moreover, conduct that routinely subjects a child to the probability that the child will be left alone because her parent is jailed endangers both the physical and emotional well-being of the child.").

Meanwhile, the Department's plan for the children was adoption by the Aunt, where the children are thriving, happy, and in a "stable, loving, healthy environment." *See A.L.G.A. v. Texas Dep't of Family & Protective Servs.*, No. 03-19-00086-CV, 2019 WL 2998587, at *9 (Tex. App.—Austin July 10, 2019, no pet. h.) (mem. op.) ("A parent's rights may not be terminated merely because the children might be better off living elsewhere, but the factfinder may consider whether termination and adoption versus an impermanent foster-care arrangement would better serve the children's best interest."). Viewing this evidence in the light most favorable to the trial court's finding, we conclude that a reasonable factfinder could form a firm belief or conviction that termination of the Mother's parental rights is in the best interest of the children. Thus, legally sufficient evidence supports the finding.

We also reach the same conclusion regarding the factual sufficiency of the evidence for similar reasons. Importantly, here there was evidence that the Mother used methamphetamine and other illegal drugs while the case was ongoing, and "[a] factfinder is

16

entitled to give 'great weight' to a parent's drug-related conduct, as it is considered a 'significant factor' supporting termination." *See A.C.*, 2019 WL 2384152, at \*9 (collecting cases and quoting *In re E.R.W.*, 528 S.W.3d 251, 266–67 (Tex. App.—Houston [14th Dist.] 2017, no pet.); *In re K.C.*, 219 S.W.3d 924, 927–29 (Tex. App.—Dallas 2007, no pet.)). Both Hall and Scibienski testified that it would be in the best interest of the children for the Mother's parental rights to be terminated and for the children to remain with the Aunt. To the extent that there is any evidence that termination of the Mother's parental rights would not be in the best interest of the children, we are unable to conclude that the evidence is "so significant that the factfinder could not have formed a firm belief or conviction" that termination was appropriate here. *See A.C.*, 560 S.W.3d at 631; *see also M. V. v. Texas Dep't of Family & Protective Servs.*, No. 03-19-00066-CV, 2019 WL 2518733, at \*6 (Tex. App.—Austin June 19, 2019, no pet. h.) (mem. op.) ("In considering a child's present and future emotional and physical needs, the need for permanence is of paramount importance, and in the end, if there are competing interests, a parent's interest must yield to the child's best interest."); *Smith*, 160 S.W.3d at 681 ("[I]n considering the best interest of the child, evidence of a recent turn-around in behavior by the parent does not totally offset evidence of a pattern of instability and harmful behavior in the past."). Accordingly, the evidence is factually sufficient to support the trial court's determination that termination of the Mother's parental rights is in the best interest of the children. We therefore overrule the Mother's sole issue on appeal.

## CONCLUSION

For these reasons, we dismiss the Father's appeal for want of prosecution and affirm the trial court's order of termination as to the Mother's parental rights.

17

_____

Melissa Goodwin, Justice

Before Justices Goodwin, Baker, and Kelly

Affirmed in Part; Dismissed in Part

Filed:   August 22, 2019